**UNITED STATES of America, Appellee,**

v.

**Rafael Isivor PINEDA,
Defendant-Appellant.**

**No. 249, Docket 82–1186.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 2, 1982.
Decided Nov. 8, 1982.

Michael E. Norton, Asst. U. S. Atty., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Gerard E. Lynch, Asst. U.S. Atty., New York City, of counsel), for appellee.

David Seth Michaels, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellant.

Before LUMBARD, CARDAMONE and WINTER, Circuit Judges.

LUMBARD, Circuit Judge:

In May of 1981, the government filed a nine count indictment against Rafael Isivor Pineda, Sixto Cristian Mayi, and "others to the Grand Jury known and unknown." The indictment charged the defendants with preparing and conspiring to prepare false documents for submission to a government agency, in violation of 18 U.S.C. §§ 371, 1001 (1976). The documents had been prepared for sale to persons applying for visas from the Immigration and Naturalization Service. Defendant Pineda pled guilty on July 28, 1981 to two of the nine counts. Pineda was represented by counsel at this time and at all relevant times thereafter.

While Pineda awaited a sentencing hearing, the government continued to examine papers recently filed by visa applicants. This led INS officers to one of Pineda's former "customers," Wenesfrienda Diaz. Diaz told the INS that she had purchased her fraudulent papers from Pineda. She also claimed that Pineda had told her to tell the INS that she had obtained the papers from someone else. The government suggested that Diaz call Pineda and tell him that the INS did not believe this story. Diaz phoned Pineda while the government listened in.

Over defendant's objection, a transcript of this conversation was introduced in evidence at a six-day sentencing hearing in April and May of 1982. On May 14, 1982 Judge Haight sentenced Pineda to four years imprisonment plus five years probation.[1]

Defendant seeks a reversal of the judgment and a new sentencing hearing. He argues that admission of the tape recorded conversation violated his sixth amendment right to counsel. We affirm the judgment.

I.

The facts established at the sentencing hearing are not disputed here. As Judge Haight found, between August 1980 and May 1981, Pineda operated a false document mill out of his "travel agency" at 2025 Amsterdam Avenue.[2] Pineda's customers were members of the Dominican Republic community in Harlem. They came to Pineda for help with applications to obtain immigrant visas for their relatives. The Immigration and Naturalization Service and the American Consulate in the Dominican Republic ordinarily require petitioners for an alien's visa to provide evidence of their ability to support the immigrant so that he or she will not become a public charge. Applicants typically submit affidavits expressing willingness to support the immigrant, letters of employment, copies of tax returns and IRS W–2 forms, and bank letters reporting the petitioner's account balances. Pineda's customers paid him several hundred dollars for forgeries of such documents.

Two of Pineda's customers are of special interest here, Fior Perez and Wenesfrienda Diaz. Fior Perez first met with Pineda on December 4, 1980. She expressed an interest in purchasing papers to support a visa

1. Co-defendant Mayi pled guilty to count one of the indictment. He was sentenced to three years of imprisonment, all but four months of which was suspended. He was placed on probation for thirty-two months.

2. Pineda testified at the sentencing hearing that he was an insurance broker and that his office

was 2025 Amsterdam Avenue. A government agent testified that the "Quisqueya Brokerage," also known as "Capital Enterprises," was a travel agency. Co-defendant Mayi appears to have operated out of an office at 963 Amsterdam Avenue called "Dominican Travel."

application for a cousin's wife, Margarita Sierra. Pineda filled the request on December 10th. Perez paid him $500 for his services.[3]

Wenesfrienda Diaz first visited Pineda's office four months later, in April of 1981. She sought documents to support her husband's visa application. Diaz and Pineda dickered about the price and settled on $465. Diaz paid $300 down and the balance on May 2. She picked up the papers the next day, May 3, 1981.

Pineda was next visited two weeks later by several INS investigators. They searched his office under warrant. They seized blank letterhead stationery and paystubs bearing the names of numerous businesses. Some of the stationery was forged. Other sheets bore names of companies that could not be located or addresses that did not exist. The agents also seized a notepad containing draft forms of employment letters; notes indicating orders for such documents; a copy of an employment letter addressed to the American Consulate in the Dominican Republic from a non-existent business address in New Jersey; a draft of an affidavit of support addressed to the same American Consulate; numerous blank and partially completed IRS W–2 forms; and a blank counterfeit social security card.

Two weeks after the search on May 29, 1981, the Grand Jury brought a nine count indictment against Pineda, Mayi and others. The first count charged the defendants with conspiring between December 1 and December 10, 1980, to defraud the United States by knowingly falsifying and concealing material facts and making and using false documents. The remaining eight counts charged Pineda and Mayi with preparing eight specified documents for Fior Perez.

Two months later, in July 1981, Pineda pled guilty to the count charging conspiracy to defraud and to another count charging the preparation of a false document for sale

to Fior Perez. Pineda appeared for sentencing in September. At that time, he objected to statements in the sentencing report that he had sold fraudulent documents to others on several occasions. The parties agreed to conduct a sentencing hearing pursuant to *United States v. Fatico,* 603 F.2d 1053 (2d Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). Defense counsel specifically requested that the government produce the persons who claimed to have purchased fraudulent documents from Pineda. The government agreed to do so.

The hearing commenced several months later in April 1982. It is during this interval, between Pineda's July 1981 guilty plea and his April 1982 sentencing hearing, that the events central to this appeal occurred.

After Pineda's plea, the INS continued investigating possible fraud in visa applications by checking papers submitted about the time of Pineda's arrest. This apparently led the INS to Wenesfrienda Diaz,[4] one of Pineda's pre-indictment customers. In January 1982, three months after Pineda pled guilty, Diaz received a letter asking her to appear at the INS office. Diaz feared that the INS had discovered the falsehoods in the documents she had submitted. She immediately sought Pineda's advice. Pineda advised her to tell the INS that she had obtained the fraudulent papers from some woman, "named Carmen, or any other name," that she had met on the street. Pineda asked Diaz to call him after the interview and to tell him what had happened.

A short time later, on January 27, Diaz met with INS Criminal Investigator Joseph Occhipinti. At first Diaz followed Pineda's advice. She told Occhipinti that she had bought the papers from a woman she had met on the street. Occhipinti told her that such papers could not be gotten on the street; they could only be obtained at a travel agency. Diaz finally confessed that

---

**3.** It was a bad bargain for Pineda at any price. "Fior Perez" turned out to be a government informant.

**4.** Diaz testified that this was the explanation INS officer Occhipinti gave her as to how the INS had found her out.

she had obtained the documents from Pineda. She also told Occhipinti that Pineda had told her to tell the story about the woman on the street. Occhipinti took Diaz to see Assistant United States Attorney Michael Norton, one of the prosecutors in Pineda's case. Norton told Diaz that she was "going to have to be a witness."

After Diaz met with Norton, Occhipinti asked her to call Pineda. Diaz made the call, and Occhipinti taped the conversation.

During the recorded conversation, Diaz told Pineda that the INS officer did not believe her story about obtaining the papers from a woman on the street. Pineda said that that was the officer's problem. He also explained to her that one of his customers had been "caught" before and that "the guy" had taken her green (residency) card. "The guy" had told her that she must tell the truth if she wanted the card back. The woman had stuck to her story, and the card had been returned. Finally, Pineda told Diaz that if the INS summoned her again, she had "no choice but to go back there and repeat the same thing over again."

At the sentencing hearing, Occhipinti testified about a sworn confession he had taken from one of Pineda's employees. Other government agents testified about the "false document paraphernalia" seized in the search of Pineda's office. The government also produced several witnesses, including Diaz, who testified that they had purchased fraudulent papers from Pineda in the months before and after the indicted conspiracy of December 1980. Diaz also testified that Pineda had told her to lie to INS officials. To corroborate this portion of Diaz's testimony, the government introduced the tapes of the January 27th conversation between Pineda and Diaz.

Pineda objected to the introduction of the tapes. He claimed that the surreptitious recording violated his sixth amendment right to counsel, and that the evidence could not be submitted at the sentencing hearing. Judge Haight ruled that Pineda's obstruction of justice was a wholly separate offense from the indicted crime; the government had a duty to investigate this obstruc-

tion of justice, and Pineda had no right to the presence of counsel during the government's investigation. From this ruling, Pineda appeals.

Pineda testified at the hearing in his own defense. He claimed that it was part of his business to type letters on letterheads provided by customers seeking assistance with immigration papers. He also claimed that he occasionally obtained job offers for such persons. He denied knowingly preparing fraudulent documents for anyone but Fior Perez. He also denied telling Wenesfrienda Diaz to lie to the INS. At the conclusion of the hearing, Judge Haight rejected Pineda's testimony as "entirely unworthy of belief;" he found that the defendant had "committed perjury throughout his testimony...."

## II.

■ We find no error in the admission of the Pineda-Diaz conversation. Officer Occhipinti's conduct did not violate Pineda's sixth amendment right to counsel.

■ It is true that ordinarily the government's deliberate use of an informer to elicit incriminating statements from the defendant after indictment violates the sixth amendment. *United States v. Henry,* 447 U.S. 264, 272–74, 100 S.Ct. 2183, 2188–2189, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Statements obtained in violation of the sixth amendment are inadmissible against the defendant in a sentencing hearing. *Estelle v. Smith,* 451 U.S. 454, 469–71, 101 S.Ct. 1866, 1876–1877, 68 L.Ed.2d 359 (1981).

Here, however, the post-indictment investigation focused on criminal activity distinct from the indicted crimes; indeed, in recording the Pineda-Diaz conversation, the government sought evidence of criminal conduct—obstruction of justice—that occurred after the indictment was filed. The government's continuing investigation into visa fraud was proper. After Pineda pled guilty, defense counsel specifically requested that the government produce witnesses who had purchased false papers from the

defendant. It was during the course of this legitimate investigation that the government interviewed Diaz and first learned that, after pleading guilty, Pineda had instructed Diaz to lie to INS officials. In a case such as this, the government may, fourth amendment considerations to one side, use an informer to elicit incriminating statements concerning conduct occurring after the crimes charged in the indictment. *United States v. Hinton,* 543 F.2d 1002, 1015 (2d Cir.1976), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 493, *and* 429 U.S. 1051, 97 S.Ct. 764, 50 L.Ed.2d 767, *and* 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 783 *and* 430 U.S. 982, 96 S.Ct. 1677, 52 L.Ed.2d 376 (1977); *United States v. Edwards,* 366 F.2d 853, 872–73 (2d Cir.1966), *cert. denied,* 386 U.S. 919, 87 S.Ct. 882, 17 L.Ed.2d 790 (1967).

We note that none of the cases holds that statements so obtained may be introduced at a trial based on the same indictment pending when the statements were made. Indeed, the Supreme Court rejected a similar proposition in *Massiah, supra.* The Court noted that the government could properly continue investigating the defendant and his confederates even after the indictment was filed; during such an investigation, an informer might lawfully elicit incriminating statements from the defendant. But, the Court held, the government could not use such statements against the defendant at his trial based on that indictment. 377 U.S. at 206, 84 S.Ct. at 1203.

However, we perceive no reason why this sort of evidence concerning post-indictment obstruction of justice should not be admissible at a hearing on sentence. The sentencing judge is entitled to know that the defendant has attempted to distort the very proceeding at which the sentence is determined. Yet, since the obstruction of justice occurred after the guilty plea, the government necessarily conducted its investigation into this activity after the indictment had been filed. In these circumstances, if we adopted defendant's understanding of *Massiah* and required the government to contact defendant's counsel before using an informer, the government would be effectively prevented from fully investigating such conduct and from obtaining such compelling evidence for the sentencing judge. We refuse to read *Massiah* as providing a shield for defendant's attempts to interfere with the sentencing process.

Here the government had reason to believe that after the indictment was filed and after he had pled guilty, the defendant attempted to prevent a witness from testifying truthfully. We hold that in such circumstances the government had a duty to conduct the sort of investigation it conducted here. And the statements it obtained are admissible at sentencing. The government listened in on one conversation. The parties discussed only one subject—Pineda's advice to Diaz that she lie to the INS. There is no suggestion in the record that the obstruction of justice claim was merely a pretext to justify wide ranging surveillance of the defendant. There is no allegation that by listening to this conversation the government obtained attorney-client confidences or learned defense strategies. *See Hoffa v. United States,* 385 U.S. 293, 306–07, 87 S.Ct. 408, 415–416, 17 L.Ed.2d 374 (1966). Indeed, the record suggests that no such allegation could be supported. Under these circumstances, defendant's sixth amendment rights were not violated.

The defendant's argument that his post-indictment instructions to Diaz to lie to the INS were part of the indicted conspiracy is contradicted by the plain language of the indictment and is without support in common sense or precedent. A subsidiary conspiracy to conceal the crime cannot be inferred merely from evidence that the "conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment." *Grunewald v. United States,* 353 U.S. 391, 402, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 (1957). See *Krulewitch v. United States,* 336 U.S. 440, 443, 69 S.Ct. 716, 718, 93 L.Ed. 790 (1949).

The judgment is affirmed.