**Charles Victor THOMPSON, Appellant,**

v.

**The STATE of Texas.**

**No. 73431.**

Court of Criminal Appeals of Texas.

Oct. 24, 2001.

Rehearing Granted in Part and Denied in Part
Dec. 19, 2001.

Floyd W. Freed, III, Spring, for Appellant.

Alan Curry, Asst. DA, Houston, Matthew Paul, State's Atty., Austin, for State.

## OPINION

MEYERS, J., delivered the opinion of the Court, joined by PRICE, WOMACK, JOHNSON and HOLCOMB.

Appellant was convicted of capital murder in April 1999. TEX. PENAL CODE ANN. § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071 §§ 2(b) and 2(e), the trial court sentenced appellant to death. TEX.CODE CRIM. PROC. ART. 37.071 § 2(g). Direct appeal to this Court is automatic. TEX.CODE CRIM. PROC. ART. 37.071 § 2(h). Appellant raises seven points of error, including challenges to the sufficiency of the evidence to support the jury's verdict. The sufficiency points will be addressed first followed by the remainder of the points in the order in which they are raised.

Around June of 1997, appellant began dating Dennise Hayslip and subsequently moved into the home she shared with her son, her co-worker Lisa Gonzalez, and Gonzalez' two daughters. While living there, appellant grew increasingly jealous, possessive, and angry. During fits of anger, appellant would throw things, kick the refrigerator, and punch or kick the walls, often leaving holes in them. Appellant rarely worked, relying on Hayslip and Gonzalez to pay the bills. Appellant became irate when Gonzalez asked him to contribute.

On one occasion, Gonzalez heard appellant screaming at Hayslip and calling her names and saw him shaking her. When Gonzalez tried to stop appellant from hurting Hayslip, appellant grabbed Gonzalez and threw her to the ground. Gonzalez thereafter attempted to call the police, but the telephone went dead. She later discovered that the telephone cord had been ripped out of the wall. Appellant eventually moved out and Hayslip moved into her own apartment.

On March 16, 1998, Gonzalez accompanied Hayslip and appellant to a local pub. Appellant became sullen and angry during the evening and told Hayslip he wanted

her to sit with him and not dance with anyone else. When Gonzalez saw Hayslip three days later, one side of her face was bruised, her lip was split, and there were bruises on her neck.

At some point in time, Hayslip met Darren Cain at a local bar where he worked as a bartender and they became friends. On the evening of April 29, 1998, Cain called his best friend, Tony Alfano, and asked him to meet him at the bar to watch the Rockets game, but Alfano declined. At 2:30 the next morning, Cain again called Alfano and told him that appellant had threatened him over the telephone. Cain told Alfano that appellant was beating up or "messing with" Hayslip and he was going over to her apartment to help her.

Kathryn Page, one of Hayslip's neighbors, woke up around 3:00 a.m. on the morning of April 30th to the sound of her dog barking and someone screaming. She heard loud voices, including a female voice saying, "stop," and "help." Page called the police and walked outside to check Hayslip's apartment number. She saw Hayslip and Cain standing outside, but neither appeared to be hurt or wounded in any way. However, Hayslip was agitated and apologizing to Cain "for all of this." Appellant then walked out of Hayslip's apartment yelling, cussing, and calling Hayslip a "whore." Page noticed at that time that appellant had a black eye. Cain told appellant to "chill," and appellant responded, "[D]o you want to die, mother fucker?"

Responding to the disturbance call, Deputy William Coker saw Cain, Hayslip, and appellant standing outside and all appeared to be calm. Coker saw that appellant's face was swollen from being in a fight, but learned that appellant had started the fight. Because no one wanted to file charges, Coker told appellant to leave the complex and followed him as he exited the property. Coker warned appellant that he would be committing criminal trespass if he returned.

About 6:00 a.m. that same morning, Page's son heard gunshots as he was leaving for school. Shortly thereafter, Page heard someone beating on her door. When she walked outside, Page saw Hayslip sitting on the ground bleeding from the mouth and gasping for breath. Hayslip made a sign with her hands like someone shooting a gun.

When Coker arrived back at the apartments, he found Hayslip sitting in a pool of blood with a bullet hole in her right cheek and a great amount of blood draining from her mouth. Coker asked her if appellant had shot her and she nodded. Coker found Cain's dead body in Hayslip's apartment.

Hayslip was taken by Life Flight to Hermann Hospital. While Hayslip was awaiting surgery, her brother asked her, "[D]id Chuck do this?" Hayslip nodded emphatically in response.

In the meantime, appellant went to Diane Zernia's home. Zernia was getting her daughter ready for school, so appellant waited for her in the living room; however, he soon fell asleep. After her daughter left for school, Zernia watched the news while appellant slept. As she watched, she saw a story about the shooting. When appellant woke up a couple of hours later, Zernia joked about his black eye stating, "I hope the other guy looks worse." Appellant replied, "He does. I shot him." Appellant told Zernia that he had been beaten up in a fight so he left the apartments where it happened to get a gun. Upon his return, he kicked in the apartment door and shot Cain four times. Appellant told Zernia that he shot Hayslip also. Zernia testified that appellant said he told Hayslip, "I can shoot you too,

bitch," and then he put the gun to her cheek and pulled the trigger. Appellant told Zernia that he threw the gun in a creek after leaving the scene.

Appellant asked Zernia if he could call his father, and his father came and picked him up from Zernia's home. Appellant's father took appellant to the police station where he turned himself in for the shooting. Appellant later called Zernia from jail in an apparent attempt to influence her to change her testimony about why he returned to the apartments.

During surgery, doctors were unable to secure an airway and Hayslip fell into a coma. A few days later, her family was told she was brain dead and they agreed to remove life support systems. Hayslip continued to live for four more days, ultimately dying a week after she was shot. The medical examiner testified that, according to the doctor who performed Hayslip's autopsy, the cause of death was a gunshot wound to the face.

A deputy with the Harris County Sheriff's Office testified that the murder weapon was eventually recovered with the help of an informant. The firearms examiner testified that, after evaluating the weapon and the evidence found at the scene of the shooting, the weapon must have been reloaded during the incident. Appellant was charged with committing capital murder by murdering more than one person during the same criminal transaction. *See* TEX. PENAL CODE ANN. § 19.03(a)(7)(A).

■ In his first point of error appellant claims the evidence is legally insufficient to support his conviction on the ground that intervening medical care was the actual cause of Hayslip's death. Appellant argues her death "was the sole result of her loss of oxygen to the brain which caused her family to terminate her life one week after she was shot" and that "[t]his event was produced by the physicians inability to

properly provide competent medical assistance."

■ In reviewing the legal sufficiency of the evidence, this Court looks at all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Texas Penal Code § 6.04(a), *Causation: Conduct and Results,* provides

A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, *unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.*

(emphasis added); *see also McFarland v. State*, 928 S.W.2d 482, 516 (Tex.Crim.App. 1996), *cert. denied*, 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997); *Felder v. State*, 848 S.W.2d 85, 90 n. 1 (Tex.Crim. App.1992), *cert. denied*, 510 U.S. 829, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993).

The shot to Hayslip's face went through her cheek and nearly severed her tongue. According to the State's medical evidence, because the tongue is especially "well vascularized" (contains more blood per gram of tissue than other parts of the body), Hayslip was at risk of bleeding to death or of bleeding down into her lungs which also could have resulted in death similar to drowning. The doctor in charge of Hayslip's care further testified that, without any medical attention, the swelling of Hayslip's tongue could have eventually obstructed her airway entirely, resulting in suffocation. He stated that without medical intervention, Hayslip would not have survived her injuries. Appellant's medical expert agreed that the injury to Hayslip's tongue was life threatening and also

agreed that Hayslip "probably" would have died without medical intervention. Thus, viewing the evidence in the light most favorable to the verdict, even assuming, *arguendo,* that the conduct of the doctors was clearly sufficient to cause Hayslip's death, the conduct of appellant was not "clearly insufficient" so as to absolve him of criminal responsibility under § 6.04. Appellant's first point of error is overruled.

In his second point of error, appellant claims the evidence is factually insufficient to support the verdict. *See Jones v. State,* 944 S.W.2d 642, 647 (Tex.Crim.App.1996), *cert. denied,* 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). Appellant continues to argue here that Hayslip would have lived, notwithstanding the wound she received, but for the negligent medical care she received at the hospital.

 In a factual sufficiency review, this Court views all the evidence without the prism of "in the light most favorable to the prosecution" and sets aside the verdict only if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Johnson v. State,* 23 S.W.3d 1 (Tex.Crim.App.2000); *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). In conducting such a review, we begin with the presumption that the evidence is legally sufficient under *Jackson, supra.* Next, we consider all of the evidence in the record, comparing the evidence which tends to prove the existence of the elemental fact in dispute to the evidence which tends to disprove it. *Santellan v. State,* 939 S.W.2d 155 (Tex.Crim. App.1997); *Jones,* 944 S.W.2d at 647. We are authorized to disagree with the jury's determination even if probative evidence exists which supports the verdict, but must avoid substituting our judgment for that of the fact-finder. *Santellan,* 939 S.W.2d at 164; *Jones, supra.* A clearly wrong and unjust verdict occurs where the jury's finding is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." *Jones, supra; Santellan, supra.*

In addition to the evidence discussed in connection with point of error one above, a physician testified for appellant that Hayslip's wound was survivable, if properly treated. Appellant points out that the treating physician testified that he and the other physician who attended Hayslip were to be subject to a civil lawsuit for Hayslip's death. On the other hand, even appellant's own expert agreed that Hayslip had sustained a life-threatening injury and would have died if she had not received medical care. Furthermore, no evidence was presented that any of the actions taken in attempting to save Haylsip's life were clearly sufficient to kill her.

In light of the medical testimony presented by the State, we cannot say that the verdict was so contrary *to the overwhelming weight of the evidence* as to be clearly wrong and unjust. We hold the evidence was factually sufficient. *See Santellan, supra; Clewis,* 922 S.W.2d at 129. Point of error two is overruled.

In his third point of error, appellant claims the trial court erred in denying his requested charge "on the law of intervening medical care as a cause of death." Appellant relies solely on *Lerma v. State,* 150 Tex.Crim. 360, 200 S.W.2d 635, 637 (1947)(opinion on reh'g). In *Lerma,* we held that when proof is presented showing that a victim's death was brought about by gross neglect or improper treatment on the part of a physician, an instruction to the jury that the defendant is not guilty of homicide is required. But the instruction required in *Lerma* rested entirely on a statute no longer in existence. The statute at issue in *Lerma,* then Texas Penal Code article 1202, provided:

The destruction of life must be complete by such act, agency, procurement or omission; but although the injury which caused death might not under other circumstances have proved fatal, yet if such injury be the cause of death, without its appearing that there has been any gross neglect or manifestly improper treatment of the person injured, it is homicide.

*Lerma v. State,* 150 Tex.Crim. 360, 200 S.W.2d 635, 637 (1947)(provision quoted). Appellant cites no comparable provision today under which such instruction should be given.

The controlling statute today, as discussed above, is Penal Code § 6.04(a), governing concurrent causation. Appellant received an instruction essentially tracking the language of § 6.04(a)[1] and he does not otherwise complain of the instruction given. Appellant was not entitled to an instruction of the sort called for in *Lerma, supra.* Point of error three is overruled.

In his fourth point of error, appellant claims the State conducted an interview with him while he was in custody pending charges in the instant case, by utilizing an undercover officer without notifying his counsel or warning him of his rights, and then used statements he made during that interrogation about his plans to commit another crime, against him at the punishment phase of the instant capital murder trial. Appellant says those statements were erroneously admitted in violation of his Sixth Amendment right to counsel.

The pertinent facts follow. Deputy Max Cox of the Harris County Sheriff's Department testified at punishment that he was approached by an inmate, Jack Reid, who told him that appellant was attempting to solicit the murder of Diane Zernia, who was slated to be a witness in his capital murder case. Reid shared a cell with appellant. Reid told Cox that appellant had already arranged for the murder by another inmate, Max Humphrey, who had also shared a cell with appellant and had recently been discharged, but was looking for someone to retrieve a gun and give it to Humphrey in order for him to carry out the murder.[2] Cox told Reid that if he was approached by appellant again, he should tell him that he knew someone who could retrieve the gun for him. Reid called Cox the next day and indicated that he had complied with Cox's instructions. Cox then arranged for Gary Johnson, an investigator with the Harris County District Attorney's Office, to meet with appellant in an undercover capacity to discuss the retrieval of the weapon and record their conversation. Johnson was to assume the identity of Reid's friend, who had supposedly been contacted by Reid about retrieval of the gun. Cox further testified that he

---

1. The jury instruction provided in part that:

 A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant clearly insufficient.

 Therefore if you find from the evidence beyond a reasonable doubt that the death of Glenda Dennise Hayslip would not have occurred but for the defendant's conduct, as charged in the indictment, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant clearly insufficient, you will find the defendant criminally responsible. Unless you so find beyond a reasonable doubt or if you have a reasonable doubt thereof you will find the defendant not criminally responsible and say by your verdict "Not Guilty of Capital Murder."

2. The gun appellant wanted retrieved was later discovered to be the murder weapon used in the instant case.

gave Johnson a map that presumably identified where the gun could be located.[3] Johnson testified that he had been contacted by Cox and had agreed to assume an undercover identity for the . purpose of meeting with appellant to discuss retrieving a weapon to be used in a murder that had possibly already been arranged. Johnson testified that he was wired for recording throughout their meeting. He further testified that appellant brought a hand-drawn map to the meeting, similar to the one Cox had given him, and held it up to the glass for him to see. At that point during Johnson's testimony, the State offered the tape into evidence.

Appellant was given permission to question Johnson on voir dire. Johnson admitted to having been aware that appellant was represented by counsel on the capital murder charge at the time of their meeting. He conceded that had not notified counsel of their meeting, had not informed appellant that he was an officer of the State, and had not given appellant any warnings. *See* TEX.CODE CRIM. PROC. art. 38.22; *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant objected and sought suppression of the tape on the ground that he had been denied counsel during the meeting with Johnson. The trial court overruled the objection and admitted the tape into evidence. The tape was played for the jury.

During their tape-recorded meeting appellant and Johnson briefly discussed retrieval of the gun. Then, appellant told Johnson that there was a witness in his case that he wanted "taken care of." Appellant stated that he had already paid Humphrey to kill the witness, but Humphrey had not gone through with the job. Appellant gave Johnson the witness' ad-

dress, and described the witness as a mother with a fourteen year old daughter and a husband. He described her car, and informed him that she was usually home in the mornings after her daughter went to school. He described her house as Victorian and her mailbox as black and white spotted, like a cow. Appellant promised that when he got out of jail, he would pay Johnson $1,500 for killing the witness. After the tape was played for the jury, Johnson testified further, without objection, that appellant had brought the map with him to the meeting, and that it had an address written on it. Johnson stated that appellant had held it up to the glass for Johnson to read.

■ The Sixth Amendment guarantees a criminal defendant the assistance of counsel at the initiation of adversary proceedings against him, and at any subsequent "critical stage" of the proceedings against him. *Estelle v. Smith*, 451 U.S. 454, 469–70, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Thus, in *Estelle*, where the defendant had been indicted and counsel appointed at the time he was subjected to a competency examination by a court-ordered psychiatrist, his Sixth Amendment rights were violated by the introduction of the psychiatrist's diagnosis against him at the penalty stage on the issue of future dangerousness. *Id.* at 470–71, 101 S.Ct. 1866. The right to counsel had attached at the time of the interview and "the interview proved to be a 'critical stage' of the aggregate proceedings" against the defendant. *Id.* at 470, 101 S.Ct. 1866.

■ But the right to counsel is "offense specific." *See Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).[4] That is, the Sixth Amendment

---

**3.** Cox testified that he received the map from the officer who did the initial interview (pre-

sumably of the informant). However, it is not clear where this officer obtained the map.

**4.** In *Maine v. Moulton,* the defendant and a

does not require the assistance of counsel as to interrogations in the course of an investigation concerning then-uncharged criminal conduct, even though other charges are pending as to which the right has attached. However, such investigations might encroach on the defendant's rights concerning the pending charges. The Supreme Court has recognized the competing interests at stake in such situation:

> The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. Moreover, law enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at a trial of either crime. In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah*. On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incrimina-

co-defendant were indicted with four counts of theft by receiving stolen vehicles and automotive parts. While out on bail, the co-defendant told police that the defendant had suggested to him that they kill a State's witness in the case. *Id.* at 162, 106 S.Ct. 477. The co-defendant ultimately agreed to wear a body wire to a meeting with the defendant where the two planned to discuss their defensive strategy in the upcoming trial. *Id.* at 165, 106 S.Ct. 477. Although the idea of eliminating witnesses was briefly mentioned at the beginning of the meeting, the defendant made many incriminating statements about his participation in the charged offenses. *Id.* at 165–66, 106 S.Ct. 477. Portions of the tape implicating the defendant in the charged offenses were admitted at trial, and the defendant was convicted. The defendant appealed on the ground that the tape's admission violated his Sixth Amendment right to counsel. The state court of appeals reversed the trial court, holding that the State could not use the recordings where the State knew or should have known that the defendant would make incriminating statements as to charges that were pending. *Id.* at 168, 106 S.Ct. 477. The United States Supreme Court upheld the state appeals court. Discussing the scope of the Sixth Amendment right to counsel, the Court stated that the State has "an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Id.* at 171, 106 S.Ct. 477. The Court explained that while the Sixth Amendment is not violated when the government, "by luck or happenstance," obtains incriminating evidence after the right to counsel has attached, but it is violated by "knowing exploitation ... of an opportunity to confront the accused without counsel." *Id.* at 176, 106 S.Ct. 477. The Court rejected the State's argument that because there was a legitimate reason for listening to the conversation—investigating a plot to kill a State's witness—the incriminating statements regarding the already-charged crime should therefore not be suppressed. *Id.* at 178, 106 S.Ct. 477. Because the police knew (or should have known), from previous conversations between the defendant and co-defendant, that their meeting was in part for the purpose of discussing the pending charges and their defense strategy, the defendant's Sixth Amendment rights were violated.

ting statements pertaining to pending charges are inadmissible at the trial of those charges, not withstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.

*Id.* at 179–80, 106 S.Ct. 477.[5]

 Thus, if the right to counsel has attached as to a charged offense, and the police interrogate the defendant in the absence of his counsel about matters that the police knew or should have known might elicit incriminating evidence pertaining to the pending charges, the Sixth Amendment right to counsel has been violated and such evidence is "inadmissible at the trial of those charges." But if, during that same interrogation, the police elicit incriminating evidence pertaining to criminal conduct that is not yet the subject of a formal charge, the Sixth Amendment right to counsel has not yet attached as to that offense, and therefore any such evidence is

admissible against the defendant at the trial on the then-uncharged offense.

 At the time of the interrogation in the instant case, appellant had been charged with capital murder but had not been charged with solicitation for murder. There is no question that evidence obtained in connection with questioning appellant about the solicitation offense would be admissible at the trial *for that offense* because his Sixth Amendment right to counsel had not yet attached as to that offense. And there is no question that evidence obtained in the course of such questioning, incriminating appellant as to his guilt for the capital murder, would be inadmissible in his capital murder trial. The question here is whether evidence obtained about the solicitation offense is admissible against appellant on the question of future dangerousness at the punishment phase of his capital murder trial, as to which appellant's Sixth Amendment rights had attached.

This issue was recently addressed by this Court.[6] *Wesbrook v. State,* 29 S.W.3d

5. These principles were reaffirmed in *Texas v. Cobb,* 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001). On direct appeal in our own Court, we had held that "once the right to counsel attaches to the offense charged, it *also attaches to any other offense that is very closely related factually to the offense charged." Cobb v. State,* 93 S.W.3d 1, 6 (Tex. Crim.App.2000). Emphasizing, as in *Moulton,* that "[t]he Sixth Amendment right [to counsel] ... is offense specific," *Cobb,* 121 S.Ct. at 1340 (quoting *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)), the Supreme Court rejected the notion that there is an exception to this principle for uncharged offenses that are "factually related" to a charged offense. *Id.* at 1343. The Court further held that when the Sixth Amendment right to counsel attaches, it encompasses offenses that, even if not formally charged, are considered the same offense as the charged offense, under *Blockburger v.*

*United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

6. At least two state courts have addressed this issue and held such evidence inadmissible at the punishment phase of the trial on in sentencing a defendant on the charges that were pending at the time of the interrogation of the uncharged offenses. *People v. Kidd,* 129 Ill.2d 432, 136 Ill.Dec. 18, 544 N.E.2d 704, 712–13 (1989)(defendant's right to counsel as to pending charges could not be circumvented even when investigating uncharged conduct if uncharged conduct was to be used against defendant at death penalty hearing in trial of charged offense); *Jackson v. State,* 643 A.2d 1360 (Del.1994)(incriminating statements obtained during investigation of uncharged conduct could be used at trial for charges arising from uncharged conduct, but could not be used against defendant at punishment phase of trial on charges that were pending at time of interrogation if "in obtaining this evidence, the State violated the Sixth Amendment by

103 (Tex.Crim.App.2000)(plurality opinion), *cert. denied,* 532 U.S. 944, 121 S.Ct. 1407, 149 L.Ed.2d 349 (2001). In *Wesbrook,* the trial court overruled a motion to suppress evidence that the defendant argued had been obtained in violation of his Sixth Amendment right to counsel. The complained-of evidence allegedly established an attempt by the defendant to solicit the murder of various individuals, including witnesses at the defendant's trial. *Wesbrook,* 29 S.W.3d at 116. Facts developed at a hearing on the matter showed that an informant, a fellow inmate at the Harris County Jail, became acquainted with the defendant about three months prior to the defendant's trial. During numerous conversations, the defendant expressed a desire to hire someone to kill two individuals (the defendant's ex-wife and her husband). The informant contacted law enforcement. In exchange for a favorable recommendation by the State during the prosecution of his own pending charges, the informant arranged a meeting between the defendant and undercover investigator Gary Johnson, who was to pose as a hit man. Johnson tape-recorded the conversation he had with the defendant concerning the murder solicitations. In the recorded conversation, the defendant expressed his desire to have murdered the two individuals he had mentioned to the informant, plus five others, four of which were to be, or already

had been, witnesses in his capital murder trial. Johnson admitted at trial that he had assumed the evidence would be used against the defendant at his capital murder trial. *Id.* at 116–17.

At the conclusion of the hearing, the trial court determined that no Sixth Amendment violation had taken place because the right to counsel had not attached to the solicitation offense. Therefore, the court concluded that the evidence was admissible and denied the defendant's motion to suppress. Seven judges on this Court disagreed, holding that a Sixth Amendment violation had occurred.[7] The three-judge lead opinion explained:

> "By intentionally creating a situation likely to induce appellant to make incriminating statements without the assistance of counsel, the State violated appellant's Sixth Amendment right to counsel. [The informant] was not housed with appellant to act as a passive 'listening post.' He was sent in with instructions to 'exploit the existing relationship he had forged with appellant in order to 'deliberately elicit' incriminating information regarding the solicitation of murder. This information was then to be used at appellant's capital murder trial to help satisfy the State's burden of establishing that appellant

knowingly circumventing the accused's right to counsel"). *But see United States v. Kidd,* 12 F.3d 30 (4th Cir.1993)(holding that because evidence related to new criminal activity and not pending charges, it was admissible for consideration under sentencing guidelines at sentencing hearing portion of trial on pending charges).

7. The lead opinion, authored by Judge Mansfield, and joined by Judges Keasler and Meyers, held there was a Sixth Amendment violation. Although Judge Meyers concurred in another point of error, he otherwise joined the lead opinion. A separate concurring opinion authored by Judge Womack, and joined by Judges Price, Holland and Johnson, agreed there was a Sixth Amendment violation, but parted ways with the lead opinion on the issue of harm arising from the violation. *Wesbrook,* 29 S.W.3d at 127–28 (Womack., J., concurring). The concurring judges found "it impossible to say beyond a reasonable doubt that the testimony [that should have been suppressed] did not influence the sentencing jury." *Id.* at 128. Presiding Judge McCormick and Judge Keller would have held there was no Sixth Amendment violation. *Id.* at 123–27 (Keller, J., concurring, joined by McCormick, P.J.).

posed a continuing threat to society. Just as a psychiatrist, acting as a state agent, cannot elicit information that would be used to help demonstrate future dangerousness without counsel being notified first, so too, a jail house informant, acting at the behest of the State, cannot elicit information to be used at any stage of trial concerning charges in which the Sixth Amendment right to counsel had already attached and counsel had not been notified."

*Id.* at 118 (citations omitted).

No developments in the law since *Wesbrook* would change or affect the holding of the seven-judge majority there.[8] We turn again to the instant case. As in *Wesbrook*, the State elicited information from appellant regarding the solicitation of the murder of a person who was to be a witness against appellant. The information was elicited by an agent of the State, without notifying appellant's counsel, and was then used at appellant's capital murder trial to help the State establish that appellant posed a continuing threat to society. The State knew the capital murder charges were pending against appellant at the time, and that any evidence incriminating appellant in another offense would probably be used against him in the capital punishment phase. We hold appellant's Sixth Amendment right to counsel was violated by the State's actions in soliciting the tape recorded conversation between appellant and Johnson and using it against appellant in the punishment phase of his capital murder trial, the charges of which were pending at the time of the conversation. *Wesbrook, supra.* The trial court should have granted appellant's motion to suppress the tape. We turn now to the question of harm. Tex.R.App. P. 44.2(a).

■ Appellant's punishment will be reversed unless we can conclude that the erroneously admitted evidence was harmless beyond a reasonable doubt. *Wesbrook, supra.* The seven *Wesbrook* judges who held there was error, split on the question of whether the error was harmful. Three of the judges concluded the error was not harmful in light of the facts of that case and the other punishment evidence, apart from the improperly admitted solicitation evidence. The evidence in the case reflected that the defendant had killed five people in the subject capital murder, had made some previous threats of violence, and that he had tried, from prison, to solicit the murder of his ex-wife and her husband. The evidence of these solicitations were admissible because it was obtained by the informant prior to his becoming an agent of the State. *Id.* at 119–20 (Mansfield, J., joined by Meyers and Keasler, J.J.). Four other judges could not say the erroneous admission of the evidence was harmless. *Id.* at 127–28 (Womack, J., joined by Price, Holland and Johnson, J.J.). They pointed to the importance of the erroneously admitted evidence in corroborating the testimony of the cell mate who might otherwise have been disbelieved, and also to the emphasis placed on the illegally obtained evidence by the State in closing arguments at punishment. *Id.* at 128. In closing, the State repeatedly relied on the tapes and urged the jury to listen to the tapes "over and over and over." *Id.*

To support a finding of future dangerousness in the instant case, the State relied on the facts of the crime itself, the unadjudicated extraneous solicitation offense, and a number of bad acts committed

---

8. *Cobb, infra* fn.5, reaffirmed previously-stated principles that were in existence at the time of *Wesbrook.*

by appellant.[9] Appellant presented testimony from a psychologist who admitted on cross-examination that appellant had trouble controlling himself whenever stimulated by strong feelings and there was no guarantee that these feelings would not be evoked by some event in the prison setting. Appellant's psychologist also admitted appellant was narcissistic and had a sociopathic personality, was a follower and could be easily manipulated. Appellant's psychologist testified that test results revealed that appellant had "chronic problems with obeying rules and exercising proper moral judgment."

Although the tape itself was inadmissible, substantively similar testimony regarding appellant's attempts to solicit the murder of the witness was before the jury that was not objected to and/or was not inadmissible. All of Cox's testimony and most of Johnson's testimony before and after the tape, was not objected to. The information that Cox initially obtained from Reid (appellant's cell mate) before Reid became an agent for the State was admissible. Cox testified without objection that he had been approached by Reid who told him that appellant was attempting to arrange for the murder of Diane Zernia, a witness in appellant's case. Reid also told Cox that appellant wanted to hire someone to recover a weapon to be used in that subsequent murder. The map showing the location of the gun was also before the jury without objection. Johnson testified that he agreed to go undercover and meet with appellant, pretending to be a friend of Reid's who could help retrieve

the weapon for appellant. Johnson also testified, without objection, that appellant had brought a hand-drawn map to the meeting, supposedly showing the location of the weapon. After the tape was played, Johnson testified further, without objection, that the map appellant had brought to the meeting also had an address written on it, and that appellant had held the map up to the glass for him to see.

Without the tape, the jury would not have known that appellant made plans with Johnson for Johnson to kill the witness, in addition to retrieving the gun. It would have heard only that Reid had reported to authorities that appellant was attempting to hire Humphrey to kill the witness.

The State emphasized appellant's taped conversation with Detective Johnson in closing arguments:

> Think about this. This shows what that defendant is like. He identifies [Diane Zerbia] for his want to be killer by describing the 14 year old soon to be motherless daughter she has. If you hadn't heard it yourself from his own mouth, you wouldn't even believe somebody would be that evil. Just mind boggling . . .

> * * * * * *

> . . . Every time [appellant] threatened he has followed through on it. What did he tell Gary Johnson? I'm a man of my word. When I get out you got a free one coming. . . . He also tried to frame an innocent man. He tried to have Gary Johnson go get the gun, give it to some-

---

9. These extraneous acts included an arrest as a juvenile for a burglary and destruction of property, trespass, and theft. Appellant was arrested as an adult for driving under the influence—and as a result of the arrest became belligerent and threatened the deputy. Appellant was also arrested by an agent of the United States Customs Service at a border

crossing where he was driving a truck filled with seventeen undocumented illegal aliens. Finally, a deputy with the Harris County Jail who was an expert on gang-related activities in penal institutions testified that letters connected to appellant had gang-related symbols on them.

body else so that person could be the one caught with the weapon and framed for the murder of the people he killed.... When he wanted to have Diane Zernia killed did it ever bother him? Did he ever flinch? Did he ever hesitate about the fact that she had a 14 year old daughter or a husband? All he was concerned with was getting the details right. That it was a cow mailbox.... Remember this. He came to that cell to meet Gary Johnson that day with that address already written down. He didn't think it up on the spur of the moment as he was talking to Gary Johnson that day. He came down there meaning to have her killed.

The evidence of appellant's future dangerousness, apart from the tape, is considerably less than the evidence of the defendant's future dangerousness in *Wesbrook*. In *Wesbrook*, the defendant had killed five people in the course of committing the subject capital murder. There was admissible evidence that the defendant attempted to solicit from prison the murders of two others (his ex-wife and her husband). These were the critical facts that led three judges to conclude the error was harmless: "because the jury possessed details of both the crime itself and the solicitation to murder, there is no reasonable likelihood that the inadmissible portion of Jones' testimony, considered either alone or in context, moved the jury from a state of nonpersuasion to persuasion regarding the issue of future dangerousness." *Id.* By contrast, the facts of the capital murder in the instant case involved two victims, rather than five. The admissible solicitation evidence pertained to the planned murder of one person, rather than two. Further, as emphasized by the four *Wesbrook* judges who could not conclude the error was

harmless, the prosecutor in the instant case emphasized the inadmissible evidence in closing. He referred the jury to statements made by appellant to Johnson on the tape. Further, as pointed out by the four *Wesbrook* judges who found the error harmful in that case, without the tape to corroborate him, Reid's testimony might not have borne much credibility. Although Cox had testified that Reid had reported appellant's efforts to solicit the murder of Zernia by a former cell mate, the tape corroborates Reid's report and further demonstrates appellant's additional efforts to see that the murder was carried out by attempting to enlist yet another hitman. We are unable to say beyond a reasonable doubt that the tape did not influence the sentencing jury. Point of error four is sustained.[10]

Appellant's conviction is affirmed. Appellant's sentence is vacated, and this case is remanded to the trial court for a new punishment hearing.

KELLER, P.J., filed a dissenting opinion, joined by KEASLER, HERVEY and COCHRAN.

KELLER, P.J., filed a dissenting opinion in which KEASLER, HERVEY, and COCHRAN, J.J., joined.

Today, the Court bars the admission of evidence even though: (1) the police did nothing wrong in obtaining the evidence, and (2) the evidence involves a defendant's attempt to subvert his trial by having one of the State's witnesses killed. This odd result is not dictated by Supreme Court precedent or by the purposes underlying the Sixth Amendment. Although this Court's opinion is consistent with its recent

10. Appellant's points of error five, six and seven, all alleging error at the *punishment* phase, are dismissed, due to our disposition of point of error four.

opinion in *Wesbrook v. State*,[1] we should take this opportunity to reexamine and disavow *Wesbrook's* conclusions about the admissibility of this type of evidence.[2]

### 1. The Supreme Court has not ruled on this issue.

The Sixth Amendment right to counsel is violated when an undercover government agent deliberately elicits from a defendant incriminating evidence of an offense for which the defendant has already been charged.[3] "The Sixth Amendment right, however, is offense specific" and does not apply to crimes for which adversary criminal proceedings have not been initiated.[4] The Supreme Court's decision in *Maine v. Moulton* addressed the application of the Sixth Amendment to undercover investigations relating to multiple crimes, some of which had been charged and some of which had not. The Supreme Court held that, even though a defendant is charged with a crime, the government may legitimately conduct undercover investigations of extraneous, uncharged crimes and use the evidence recovered in prosecutions for the extraneous crimes.[5] However, the government may not use evidence pertaining to the charged offense at the trial of the charged offense even though the evidence may have been obtained incidentally during the government's investigation of uncharged, extraneous crimes.[6] What *Moulton* did not decide is whether (or to what extent) the government may use evidence pertaining to an uncharged, extraneous offense at the trial of the charged offense.[7] That issue was presented in *Wesbrook* and is presented now in this case.

### 2. *Cobb* should motivate us to rethink our holding in *Wesbrook*.

In *Texas v. Cobb*, the United States Supreme Court disavowed the doctrine, expounded by several lower courts including this Court, of extending the Sixth Amendment right to counsel to uncharged offenses that are closely related factually to the charged offense.[8] The Supreme Court pointed out the error of expanding the scope of the Sixth Amendment right to counsel beyond the Supreme Court's earlier pronouncements: "We hold that our decision in *McNeil v. Wisconsin* ... meant what it said, and that the Sixth Amendment right is 'offense specific.'"[9] As the lead opinion observes, *Cobb* does not speak directly to the issue at hand. Nevertheless, the Supreme Court's restrictive construction of the Sixth Amendment right to counsel is at odds with our expansive interpretation of the right in *Wesbrook*. *Cobb* illustrates that this Court should not too hastily extend the Sixth Amendment right

---

1. 29 S.W.3d 103 (Tex.Crim.App.2000).

2. Some of the arguments in this opinion are discussed in greater detail in my concurring opinion in *Wesbrook*. *Id.* at 123–127 (Keller, J. concurring).

3. *Maine v. Moulton*, 474 U.S. 159, 171–174, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *see also Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

4. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).

5. *Moulton, supra; see also McNeil*, 501 U.S. at 176.

6. *Moulton, supra; see also United States v. Terzado Madruga*, 897 F.2d 1099, 1110 (11th Cir.1990).

7. *See Moulton, supra; Wesbrook*, 29 S.W.3d at 123–127 (Keller, J. concurring).

8. 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001).

9. *Id.* at 1339 (citation omitted).

to counsel to situations not directly addressed by the Supreme Court.[10]

### 3. The Sixth Amendment right to counsel should not apply here.

The lead opinion in *Wesbrook* relied upon the Supreme Court's opinion in *Moulton* to support its conclusion that a constitutional violation occurred. But four factors distinguish this case from *Moulton* and support finding that there was no Sixth Amendment violation.

#### a. The evidence consisted of proof of an extraneous, uncharged offense.

In *Moulton*, the Supreme Court was concerned that law enforcement officials might fabricate the existence of an extraneous offense to use as a pretext to elicit evidence of the charged offense.[11] But the present case is not one in which authorities investigated an extraneous offense and incidentally found proof of the charged offense. Here, the police investigated an extraneous offense, and evidence of that offense is exactly what they discovered. That the extraneous offense may have pro-

bative value in a prosecution for the charged offense is immaterial because it is still an extraneous offense. As the Sixth Amendment right to counsel had not attached to the uncharged extraneous offense, the police were entitled to investigate that offense, and the State should be allowed to use that evidence in any proceeding brought against the defendant.

#### b. Statements that constitute a crime or show an intent to commit future criminal activity do not deserve Sixth Amendment protection.

The statements made by Moulton related the details of a past crime.[12] The statements made by appellant, however, constituted a present crime (solicitation of murder) or a proposed future crime (murder, to be carried out in the future). This works strongly against finding a Sixth Amendment violation. Federal cases in the Seventh and Eleventh Circuits have held that the Sixth Amendment does not bar admission, at the trial for the charged offense, of statements that constitute a present crime or address a crime to be committed in the future.[13] Statements

---

10. In any event, we should not consider ourselves wedded to our prior decision in *Wesbrook*. Although seven judges agreed that the defendant's statements were erroneously admitted, *Wesbrook* was a fractured decision. The lead opinion (plurality) found error but held it to be harmless, the dissent found reversible error, and this writer authored a concurring opinion finding that no error occurred. Although the concurring opinion offered three reasons for finding that there was no constitutional violation, neither the lead opinion nor the dissent chose to respond to those arguments. And because the lead opinion found the error to be harmless, its pronouncement that there was error was not necessary to the resolution of the case. Given these circumstances, we should not feel constrained by the force of precedent to follow *Wesbrook*.

11. *Moulton*, 474 U.S. at 180, 106 S.Ct. 477.

12. When Moulton raised the possibility of killing a government witness, he may well have been proposing a future crime, but that evidence was obtained before the informant became a government agent and was not the focus of the opinion in *Moulton*.

13. *United States v. Moschiano*, 695 F.2d 236, 240–243 (7th Cir.1982), *cert. denied*, 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983); *United States v. Darwin*, 757 F.2d 1193 (11th Cir.1985), *cert. denied*, 474 U.S. 1110, 106 S.Ct. 896, 88 L.Ed.2d 930 (1986). A similar holding occurred in *Grieco v. Meachum*, 533 F.2d 713, 717–718 (1st Cir.), *cert. denied*, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976), but the First Circuit subsequently held that *Grieco* had been overruled by *Moulton*. *Bender*, 221 F.3d 265, 269 n. 4 (1st.Cir.2000).

that constitute a present crime or propose a future crime are uniquely outside the attorney-client relationship because there is no right to the assistance of counsel in committing a new crime.[14] These types of statements are not covered by the attorney-client privilege, and the ethical rules do not require attorneys to keep such information confidential.[15] If a defendant made such statements in counsel's presence, counsel might be obligated to reveal those statements.[16] If counsel had been present during the exchange between appellant and the undercover informant, any advice to the defendant to refrain from making the statements would be "not because the statements would have shown a consciousness of guilt of complicity in ... murder, but because his statements, themselves, were the operative acts of a separate criminal offense."[17] As the Eleventh Circuit has noted, "*Massiah* is not a magic cloak with respect to future conduct."[18]

### c. Criminal attempts to subvert a trial do not deserve Sixth Amendment protection.

What appellant attempted to do here was to subvert his criminal trial by killing one of the prosecution's witnesses. When the new criminal activity involves an attempt to subvert a defendant's upcoming trial, a form of estoppel should arise with regard to any Sixth Amendment claim the defendant might otherwise have: the defendant should not be permitted to claim that he was wronged by the admission of such evidence at the very proceeding the defendant has tried to improperly influence:[19]

> [W]e perceive no reason why this sort of evidence concerning post-indictment obstruction of justice should not be admissible at a hearing on sentence. The sentencing judge is entitled to know that the defendant has attempted to distort the very proceeding at which the sentence is determined. Yet since obstruction of justice occurred after the guilty plea, the government necessarily conducted its investigation into this activity after the indictment had been filed. In these circumstances, if we adopted defendant's understanding of *Massiah* and required the government to contact defendant's counsel before using an informer, the government would be effectively prevented from fully investigating such conduct and from obtaining such compelling evidence for the sentencing judge. We refuse to read *Massiah* as providing a shield for defendant's attempts to interfere with the sentencing process.[20]

Appellant's argument is akin to that of a defendant who has murdered his parents asking the court to take pity on him because he is an orphan.

14. *Moschiano*, 695 F.2d at 241; *Darwin*, 757 F.2d at 1200.

15. *Grieco*, 533 F.2d at 718 n. 4 ("The privilege generally does not extend to confidences concerning present and future criminal activity"); *see also* Tex.R. Evid. 503(d)(1); Tex. Disc. R. Prof. Conduct 1.05(c)(7) & (8).

16. *Darwin*, 757 F.2d at 1200; *see also* Tex. Disc. R. Prof. Conduct 1.05(e); *Henderson v. State*, 962 S.W.2d 544, 554–556 (Tex.Crim. App.1997).

17. *Grieco*, 533 F.2d at 718 (ellipsis inserted).

18. *Darwin*, 757 F.2d at 1199 (quoting *United States v. DeWolf*, 696 F.2d 1, 3 (1st Cir.1982)).

19. *Id.* (noting the irony that attempts by a defendant to improperly influence a proceeding may then become admissible in that proceeding; if so, "that is the defendant's lookout"); *United States v. Pineda*, 692 F.2d 284, 288 (2nd Cir.1982).

20. *Pineda*, 692 F.2d at 288.

#### d. The evidence should at least be admissible at punishment.

The disputed evidence in *Moulton* was presented during the guilt phase of trial, while the evidence here was presented during the punishment phase. Recently the First Circuit, while holding such evidence to be inadmissible at the guilt stage of trial, indicated that it would be admissible at sentencing.[21] And in *United States v. Kidd*, the Fourth Circuit held that the Sixth Amendment was not violated by the introduction of an extraneous offense (elicited by an undercover agent after indictment in the primary case) at the sentencing phase of trial for the charged offense.[22] In *Kidd*, the defendant was charged with several offenses regarding the possession and distribution of cocaine.[23] Later, an undercover informant made a tape-recorded purchase of cocaine from the defendant.[24] The defendant pled guilty to one of the earlier distribution offenses, and at sentencing, the post-indictment sale was introduced as relevant conduct to enhance the defendant's punishment under the Federal Sentencing Guidelines.[25] Although the court expressed doubt about the propriety of introducing this evidence at the guilt stage of trial,[26] it held that the Sixth Amendment did not prohibit the introduction of the evidence at sentencing.[27] In arriving at this holding, the Fourth Circuit remarked, "The Sixth Amendment does not create a sanctuary for the commission of additional crimes during the pendency of an indictment."[28]

For these reasons, I would hold that the trial court did not err in admitting appellant's statements.

21. *Bender,* 221 F.3d at 271.

22. *United States v. Kidd,* 12 F.3d 30, 32–34 (4th Cir.1993), *cert. denied,* 511 U.S. 1059, 114 S.Ct. 1629, 128 L.Ed.2d 352 (1994).

23. *Id.* at 31.

24. *Id.* at 32.

25. *Id.*

26. *Id.* at 33 n. 2.

27. *Id.* at 33. *But see Jackson v. State,* 643 A.2d 1360, 1374 (Del.1994), *cert. denied,* 513 U.S. 1136, 115 S.Ct. 956, 130 L.Ed.2d 898 (1995)(disagreeing with *Kidd's* holding that extraneous offenses, so obtained, are admissible at sentencing).

