**AFFIRMED and Opinion Filed January 26, 2022**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-01178-CR

## GEORGE GUO, Appellant
## V.
## THE STATE OF TEXAS, Appellee

**On Appeal from the 194th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F19-00090-M**

## MEMORANDUM OPINION

Before Justices Schenck, Smith, and Garcia
Opinion by Justice Smith

Appellant, George Guo, was convicted by a jury of capital murder for intentionally causing the death of K.B.[1] by asphyxiating her while in the course of committing or attempting to commit aggravated sexual assault of her.[2] The assault on K.B. was alleged to have occurred on June 19, 1988. She died on February 22,

---

[1] Although the sexual assault victims named in this appeal are not minors, we identify the victims by initials because appellant did so in his brief.

[2] *See* Act of May 28, 1973, 63rd Leg., R.S., ch. 426, art. 2, § 1, sec. 19.03(a)(2), 1973 Tex. Gen. Laws 1122, 1123 (capital murder defined, in part, as intentionally committing murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape, or arson); Act of May 29, 1983, 68th Leg., R.S., ch. 977, § 6, sec. 19.03(a)(2), 1983 Tex. Gen. Laws 5311, 5317 (amending "aggravated rape" to "aggravated sexual assault"; version in effect at time of offense) (amended 1993, 2003) (current version at TEX. PENAL CODE ANN. § 19.03(a)(2)).

2018. As required by law, the trial court sentenced appellant to confinement for life.[3]

On appeal, appellant challenges (1) the sufficiency of the evidence to show that he sexually assaulted K.B.; (2) the sufficiency of the evidence to show that the cause of K.B.'s death was the assault from thirty years' prior; (3) the trial court's admission of extraneous sexual assault offenses to show identity; (4) the trial court's denial of his requested jury instructions regarding concurrent causation; and (5) the trial court's denial of his motion to dismiss in which he asserted prosecution was barred by the statute of limitations. Because we reject each of appellant's issues, we affirm.

**Background**

K.B. was a twenty-eight-year-old female living in Highland Park at the time of the June 1988 assault. She had recently graduated from medical school and passed her boards. K.B. was scheduled to move to New Orleans the week after the assault to attend Tulane University and start her residency in psychiatry. The evidence shows that the assault likely took place around 3:00 a.m. on Sunday, June 19, which was Father's Day and K.B.'s father's birthday. K.B.'s family planned to have lunch together and celebrate. However, when K.B. did not show up as planned and did

---

[3] *See* Act of May 28, 1973, 63rd Leg., R.S., ch. 426, art. 2, § 2, sec. 12.31(a), 1973 Tex. Gen. Laws 1122, 1124 (version in effect at time of offense) (amended 1991, 1993, 2005, 2009, 2013) (current version at TEX. PENAL CODE ANN. § 12.31(a)) (shall be sentenced to life for capital felony); Act of May 28, 1973, 63rd Leg., R.S., ch. 426, art. 2, § 1, sec. 19.03(b), 1973 Tex. Gen. Laws 1122, 1123 (version in effect at time of offense) (current version at TEX. PENAL CODE ANN. § 19.03(b)) (capital murder is a capital felony).

not answer the phone when her family tried calling, her sister went to her apartment to check on her.

K.B.'s sister testified that the front door was not latched. She pushed it open and heard mumbling. K.B. was slumped over the bed; her head was wedged between the bed and the nightstand, touching the floor, and her legs were wedged between the headboard and the mattress. K.B. was wearing a lavender night gown with no underwear or bra; the nightgown was pulled up above her waist. K.B.'s sister unwedged her from the bed and called for help. K.B.'s eyes were dilated, her face was extremely battered, and her head was swollen; it looked bloated. She also had injuries to her arm. One of the responding officers testified that it looked like she had been choked and lost her bodily functions because there was urine on the walls, bed sheets, mattress, and floor.

K.B. was rushed to the hospital and subsequently diagnosed with an anoxic brain injury. Medical personnel performed a sexual assault exam and took a vaginal swab as well as fingernail clippings. Police collected multiple items from K.B.'s apartment including a hairdryer that police believed could have been used to strangle K.B. and the sheets and mattress cover from her bed. Police also discovered that the sliding glass door was slightly open. They dusted for fingerprints on her car and on champagne glasses in the kitchen. DNA testing was not being utilized at the time, and the police were unable to find K.B.'s attacker through other means of investigation.

Appellant became a suspect in November 1990 when he was arrested and "basically stopped from committing a sexual assault" against another female, K.A.B., who was an SMU student and also lived in Highland Park, because the elements of K.A.B.'s assault were very similar to K.B.'s assault. However, at the time, police did not believe they had enough evidence to file a case against appellant. K.B.'s case went cold.

Due to the severity of her brain injury, K.B. was never able to describe what happened to her that night or communicate much at all; she never had a normal conversation again. She was never able to practice medicine, walk without assistance, feed herself, or otherwise care for herself. She required a specially-built wheelchair that included a strap connected to a brace around her head because she could not hold her head up. K.B. spent months in the hospital and at a rehab center before going home. She received constant care and her condition declined. Ultimately, her family placed her in a long-term care facility in Oklahoma, but she developed complications from her inability to move and function normally. In 2017, medical personnel told the family there was nothing more they could do to care for K.B. She died on February 22, 2018.

The Oklahoma medical examiner was required to perform an autopsy of K.B. due to her family's request that she be cremated. The medical examiner learned that K.B. had been assaulted in 1988 and suffered an anoxic brain injury. He opined that the brain injury was the cause of her death and that the manner of death was

homicide. As a result, he alerted the Highland Park Police Department, and the case was reopened.

The police requested the Southwest Institute of Forensic Science test several items collected from K.B.'s apartment in 1988 for DNA and compare collected DNA samples with any DNA found on those items as well as on the vaginal swab collected from K.B. Appellant once again became a suspect through an investigative DNA lead. After a confirmation buccal swab was collected from appellant, a forensic analyst compared the DNA from appellant's buccal swab to the sperm cell fraction collected from K.B.'s vaginal swab and confirmed that there was less than a one in ten trillion possibility that someone other than appellant was the contributor of the male DNA found on the vaginal swab.

Appellant was arrested and subsequently convicted of the capital murder of K.B. This appeal followed.

**Sufficiency of the Evidence**

*A. Standard of Review*

In reviewing the legal sufficiency of the evidence, we consider whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We review the evidence in the light most favorable to the verdict and defer to the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate

facts. *Jackson*, 443 U.S. at 319; *see also Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012); *Isassi*, 330 S.W.3d at 638.

When conducting a legal sufficiency review, we consider all evidence in the record regardless of whether it was properly or improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Furthermore, a criminal conviction may be based on circumstantial evidence. *Id.* "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

## B. Sexual Assault

In his first issue, appellant claims that the evidence was legally insufficient to prove that he committed capital murder because the State failed to prove beyond a reasonable doubt that he committed aggravated sexual assault against K.B. or even physically harmed her. Even though his DNA was present on K.B.'s vaginal swab, appellant argues this only proves that they had sex one time, not that he sexually assaulted her or committed a crime against her. To support his contention that the evidence is legally insufficient, he emphasizes that no DNA was recovered from the hairdryer, his DNA profile was excluded as being a contributor to the DNA profile from the stains on the mattress cover, the fingerprints pulled from K.B.'s car and apartment were not of comparable value and thus not linked to him, there was no

forced entry to her apartment, there is no evidence that K.B. was sexually assaulted versus had consensual sex, and there is no evidence of when the sex occurred.

Appellant was charged with intentionally causing the death of K.B. by asphyxiating her with a hairdryer cord, or ligature, or hands, or other object known or unknowable to the grand jury while in the course of committing or attempting to commit aggravated sexual assault of K.B. Appellant's argument focuses on what evidence was not presented and suggests that there is an innocent explanation for why his DNA was found in K.B.'s vaginal vault. But the State is not required to disprove every innocent explanation of the evidence before a jury can find a defendant guilty. *Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016).

Here, K.B. was found beaten and strangled to near death in a contorted position in her bedroom wearing only a nightgown with blood smeared on the wall and the sheets and bedding in disarray. Her underwear was found nearby. Although K.B. was never able to tell anyone that she had been sexually assaulted due to the severity of her injuries, responding medical personnel and hospital personnel believed that is exactly what happened. As a result, medical personnel ordered a sexual assault exam. The likelihood that someone else contributed the DNA found in K.B.'s vaginal vault besides appellant was less than one in ten trillion.

Furthermore, a neighbor heard banging and yelling in K.B.'s apartment around 3:00 a.m., which lasted approximately thirty minutes. This timeframe for the assault is consistent with medical personnel's observation of nonmotile sperm in

K.B.'s vaginal vault when she was evaluated at the hospital that afternoon. An obstetric gynecologist testified ejaculation had to have occurred at least six hours prior but acknowledged that it could have occurred up to sixteen or twenty-four hours prior. However, police were unable to find any evidence that appellant and K.B. knew each other professionally or personally, and there is no evidence that appellant contacted K.B.'s family to check on her after her assault. Thus, it was within the jury's province to believe that the sexual intercourse occurred during K.B.'s attack, not during a previously consensual encounter.

Additionally, the State proved that appellant was K.B.'s attacker through evidence of appellant's other sexual assaults of women similarly situated to K.B. Prior to his conviction for K.B.'s murder, appellant pleaded guilty to and was convicted of the 1990 burglary of a habitation of K.A.B. and the 1998 burglary of a habitation with intent to commit sexual assault of F.M.

K.A.B. testified that she was a student at SMU when she was attacked by appellant during Thanksgiving break in 1990. After working Thanksgiving morning, she came home to her apartment in Highland Park and saw an Asian male, who she had never seen before, coming down the outside stairs. Later that night, he entered her apartment. K.A.B. was home alone and sleeping when her puppy woke her up by walking up and down her body, growling, and looking in the direction of the doorway. She looked out her bedroom door and thought she saw a person on the

stairs. A huge rush of adrenaline came over her, and she turned and slammed the bedroom door shut. She locked the door and called 9-1-1.

As the call was going through, appellant kicked in her bedroom door, sprayed her with a substance similar to tear gas, and yanked the phone out of the wall. K.A.B. testified that the substance burned and interfered with her eyesight and her ability to process. Appellant tied her up with her arms behind her back. She asked him what he wanted, and he said, "I want money." She told him there was money in her purse on the couch, but it became evident that he did not want money. He pushed her down on her bed and put something in her mouth. He then put his hands down her nightshirt and touched her breasts. K.A.B. thought he was going to rape her; she was terrified and was not sure she would live through the night.

K.A.B. could see the red and blue lights of police vehicles through the window when they arrived, but appellant did not stop touching her. The police knocked on her door, and appellant told her that if she said anything, he would kill her. Despite his threat, she screamed a "crazy loud animal scream" and police kicked in the front door. Appellant ran out of the bedroom, jumped off the balcony, and was arrested. K.A.B. testified that the deadbolt would not lock on the balcony door because of foundation issues, but her and her roommates had not been too concerned because one could not access the balcony from street level. Appellant, however, had climbed a ladder to get on the balcony and gain entry to her apartment. Police found two screwdrivers, one liquid vial of Phenergan (which treats nausea but can also make

–9–

one sleepy), one liquid vial of Benadryl, a 5cc syringe, two needles, a glass cutter, two condoms, and military grade tear gas in appellant's possession. Appellant subsequently pleaded guilty to burglary of a habitation and was convicted.

In 1998, F.M. was also a young college student and home alone when appellant attacked her. She was twenty years old at the time and living with her parents while attending the University of Houston. As she was getting ready one afternoon for class, she saw an Asian male walking in front of her house carrying something in his left hand. She ducked because she thought he saw her through the window getting ready. F.M. continued to get ready and heard the garage door slam. She thought it was her father coming home, but it was appellant, the same Asian male she had seen outside moments before.

F.M. first thought he was there to rob them and screamed at him asking him what he wanted. He told her to shut up and started punching her in the face. Appellant grabbed her hair dryer and wrapped it around her neck several times and pulled it as tight as he could. She was screaming but then started to lose her hearing and everything started to turn black. She lost her vision, "lost oxygen," could not breathe, and lost consciousness; she thought he was going to kill her.

When she regained consciousness, appellant had moved her to a different part of the room and placed a pillow "on top of [her] head." He was behind her. Appellant ripped down her overalls and lifted up her shirt. He fondled her breasts and inserted his fingers into her vagina. He still had the hair dryer cord around her

–10–

neck and was holding it while he penetrated her. F.M. testified that he was there for about an hour.

During the assault, he asked her how old she was and if she was a virgin. She asked for some water, trying to find a way out of the situation, and even tried telling him her father was coming home soon. When he stopped assaulting her, he stroked her back and then kicked her and threw a blanket over her body. He rummaged through her drawers and clothes before leaving through the sliding door to the backyard. She called 9-1-1, and appellant was later arrested and convicted based on his guilty plea to burglary of a habitation with intent to commit sexual assault.

Similar to K.B., F.M. suffered a lesion on her brain due to lack of oxygen. F.M. also had marks on her neck from the hair dryer cord, suffered a fractured right "orbit," and had bruising all over her face, on her shoulder, and down her left arm.

Appellant's attacks of K.A.B. and F.M. supported the State's theory that appellant did not have consensual sex with K.B. but, instead, was the person who entered her apartment, sexually assaulted her, and asphyxiated her to near death.

Appellant also claims that the DNA statistic reported—less than one in ten trillion—is "more preposterous than alchemy or sorcery," absurd, and total nonsense. But appellant did not challenge the testimony regarding this statistic at trial, nor does appellant present any legal authority in which a court has held that such DNA statistics are unreliable or cannot support a conviction for an offense involving sexual assault. Conversely, the State points us to two cases in which the

appellate court found that DNA evidence was sufficient to support a conviction for aggravated sexual assault when the victim could not identify her attacker. *See Roberson v. State*, 16 S.W.3d 156, 162, 165–69 (Tex. App.—Austin 2000, pet ref'd) (DNA probability statistic conservatively reported as 1 in 5.5 billion; victim could not identify her attacker); *Williams v. State*, 848 S.W.2d 915, 917 (Tex. App.—Texarkana 1993, no pet.) (DNA probability statistic reported as 1 in 12.5 million as to defendant Williams; victim was unable to identify her assailants).

Considering the combined and cumulative force of the evidence and viewing the evidence in the light most favorable to the verdict, we conclude the jury could reasonably infer that sex between appellant and K.B. was nonconsensual because there was no evidence that she knew appellant; no one else's DNA was found inside her vaginal vault; and she was found beaten and strangled with her underwear nearby. *See Merritt*, 368 S.W.3d at 525 (holding court should not use a "divide-and-conquer" approach when reviewing the State's evidence and should instead consider the "combined and cumulative force" of the evidence supporting the conviction). The evidence was legally sufficient to prove that appellant sexually assaulted and asphyxiated K.B. Appellant's first issue is overruled.

## C. Causation

In his second issue, appellant claims that the evidence was legally insufficient to prove that he committed capital murder because the causal link between the injuries K.B. suffered in June 1988 and her death on February 22, 2018, was too

attenuated. Appellant points to evidence that K.B.'s condition improved before she left the hospital and while at the rehabilitation center in 1988. Appellant claims that her decline and eventual death occurred because her medical providers failed to help her continue to progress after her initial improvements at the hospital and rehabilitation center and because, in 2017, the family decided to discontinue her care. He suggests that it is now impossible to know how much longer K.B. might have lived if they had continued treatment. Therefore, appellant argues, the State failed to prove a causal link between the 1988 attack and her death in 2018.

We find appellant's argument to be without merit. It is true that K.B. was eventually able to say some words and take some steps with great assistance, but this improvement was fleeting. Moreover, the family's decision to discontinue K.B.'s care was the result of medical advice—there was nothing more medical personnel could do to treat K.B. The evidence overwhelming showed that K.B. suffered a severe anoxic brain injury as a result of the attack in 1988 and that she ultimately died as a result of that injury. As one doctor opined, had she not been found at her apartment that morning, "She would have died right there."

The State's medical experts explained that an anoxic brain injury occurs when there is a complete lack of oxygen to the brain causing the brain to lose function and the brain cells to die. A hypoxic brain injury is when there is a low level of oxygen in the bloodstream, and it can be just as destructive as an anoxic brain injury

overtime. Asphyxiation by a hair dryer cord, a ligature of any kind, or even hands is consistent with producing an anoxic or hypoxic brain injury.

The responding paramedic described K.B.'s face as having a blue discoloration. She was found unresponsive with bruises on her neck and face, a bulging right eye, abrasions on her face, neck, legs, and feet, and minor lacerations on her feet. He testified that bruises occur on the neck when the neck receives pressure to the point that it compromises the airway. K.B. was having difficulty breathing—it was shallow—and both her pupils were dilated indicating a lack of oxygen for a long period of time.

Dr. Ralph Gillespie Greenlee, Jr., one of K.B.'s treating physicians and the neurologist supervisor of the resident neurology department at Parkland Hospital, testified that K.B. had severe neurological damage to her brain and spinal cord. She suffered many complications resulting in serious impairment. These complications included the following:

- Visual hallucinations and simple distortion due to injury to the portion of the brain where visual images are formed (such injury is consistent with a lack of oxygen to the brain);

- Difficulty looking down, which indicated injury to the upper portion of the brain stem where eye movements coordinate with the visual image;

- Spasticity in her right upper extremity meaning the "programs" in the spinal cord were injured and disassociated from the information coming down from the brain itself;

- No functional use of her left hand, which was consistent with spinal injury and having blood shut off from her vertebral artery in her neck;

–14–

- Spasticity in both lower extremities;

- Severe short term memory loss and seizures; and

- True cell death in the deeper parts of her brain, meaning the cells could not start functioning again.

Dr. Greenlee explained that, at the time he treated K.B., she had an "ominous prognosis for recovery" and would need care for the rest of her life. She would be subject to bed sores, recurring urinary tract infections, and poor nutrition. Another treating doctor testified that it was unlikely that K.B. would have a significant amount of recovery from this kind of injury.

When K.B. returned home, she required constant care. The family hired a live-in caretaker who worked five or six days a week to care for K.B. alongside her mother.

Loud noises and too much activity agitated her. She would wail and scream and was unable to go out in public because it was too upsetting. Due to injury to the deep structure of her brain, she suffered arm and leg contractions. The contractions caused her body to get stuck in an abnormal position, "like a contortionist being stopped in one position." Dr. Greenlee explained the abnormal position could lead to bed sores, chronic infections, pneumonia, and urinary tract infections. A baclofen pump was surgically placed to help with the contractions and ease K.B.'s pain; however, K.B. then became too relaxed and was unable to stand even with assistance. Ultimately, her family moved her to a long-term nursing facility because

her mother could not physically move her and K.B. was unable to help. She became bedridden because her body was no longer able to conform to a wheelchair.

At the long-term care facility, K.B. was fed with a feeding tube because she did not have good control of chewing or swallowing and would aspirate. K.B. could only tolerate small amounts even through the feeding tube because of her immobility, which led to constipation. As expected, the contractions led to pressure sores because K.B. could not move.

Dr. Greenlee testified that he was not surprised that K.B. ultimately died because of the 1988 injury: "The attack and results of that attack put her in the position to die prematurely for sure, one way or the other." Dr. Kathy Adrian Toler, who was a resident in neurology when she treated K.B. at the hospital in 1988, also testified that she would not be surprised if K.B.'s death was ruled a homicide due to this brain injury because homicide would be consistent with the brain damage K.B. sustained. Dr. Alan Martin, a non-treating neurologist and the State's expert, was also not surprised that K.B. never recovered as he explained that there was nothing that could have been done to improve her neurological condition. He opined that K.B. died from the results of her anoxic brain injury.

Prior to her assault, K.B. was very active, outgoing, and healthy. There is no evidence that she had any medical issues until the assault.

The medical examiner, Dr. Jeremy Shelton, defined "cause of death" as "the disease or injury process that leads to an unbroken chain of event[s] culminating in

someone's death." He explained that he can enter an undetermined manner of death if there are competing possibilities or other potential causes. He defined a "delayed death" as "where the death occurs sometime after the initial disease process or injury that incited that chain of events leading to death."

K.B.'s brain autopsy showed evidence of encephalomalacia, which the medical examiner explained was softening and shrinkage of the brain, or loss of brain tissue, usually due to low blood supply in the brain like an anoxic or hypoxic ischemic brain injury. She had multiple chronic pressure ulcers, acute chronic pyelonephritis (infection of the kidney), nephrolithiasis of the right kidney (kidney stones), bilateral acute bronchopneumonia (infection of the lungs), and a benign hemangioma (small growth comprised of blood vessels) in her liver.

Dr. Shelton testified that K.B.'s probable cause of death was "complications of a remote or an old hypoxic ischemic brain injury, due to probably a strangulation event." He concluded that the manner of death was homicide. Dr. Shelton further explained that the chronic pressure ulcers and bilateral acute bronchopneumonia could be medically attributed back to the brain injury. The autopsy revealed no evidence of recent injuries, cancer, or cardiovascular disease beyond hypertension. He did not find another cause, or a concurrent cause, of death that was not linked to the brain injury.

Appellant did not contest the State's evidence through cross-examination or his own medical experts. The State's evidence was unchallenged and was legally

–17–

sufficient to show that appellant's act of asphyxiating K.B. on June 19, 1988, caused her death on February 22, 2018. There was no evidence before the jury that anything other than appellant's actions caused K.B.'s death.

Appellant also argues that delayed-death cases have never involved a time-differential of anywhere close to twenty-nine years and eight months between the triggering event and death and, therefore, we should not allow such speculation and unreasonable inferences to sustain a capital murder conviction. But the Texas cases appellant relies on do not hold a conviction for murder cannot stand when the death occurs almost thirty years after the attack. The courts focus on the cause of death, not the time between the cause and the ultimate death. These cases look to whether there is a concurrent cause of death, other than the defendant's conduct, that is clearly sufficient by itself to cause the death and whether the defendant's conduct is clearly insufficient by itself to cause the death. *See* TEX. PENAL CODE ANN. § 6.04(a); *Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986). If the concurrent cause is clearly sufficient and the defendant's conduct is clearly insufficient to cause the death, the defendant cannot be convicted. *Robbins*, 717 S.W.2d at 351. We agree with that reasoning.

For example, in *Deavila v. State*, this Court rejected the appellant's argument that the victim's failure to continue physical therapy, use of illegal drugs, and discontinuation of his blood thinning medicine constituted a concurrent cause that was clearly sufficient to cause his death where appellant had shot the victim leaving

–18–

him a quadriplegic. No. 05-03-00705-CR, 2004 WL 858912, at *1, 3 (Tex. App.—Dallas Apr. 22, 2004, pet. ref'd) (not designated for publication). "Although these factors may have contributed in some way to the blood clots that resulted in [the victim's] death, had [the victim] never been shot by appellant or [his accomplice], physical therapy and blood thinning medication would have been unnecessary." *Id.* at *3. The evidence showed that the victim developed blood clots in his lungs due to the quadriplegia. *Id.* at *2. "But for [the victim's] quadriplegia caused by the shooting, he would not have died." *Id.* at *3.

In *Thompson v. State*, another case relied on by appellant, the Texas Court of Criminal Appeals rejected Thompson's argument that the victim's "death 'was the sole result of her loss of oxygen to the brain which caused her family to terminate her life one week after she was shot' and that '[t]his event was produced by the physicians inability to properly provide competent medical assistance.'" 93 S.W.3d 16, 20 (Tex. Crim. App. 2001) (change in original). The doctor in charge of the victim's care testified that the victim would not have survived her injuries without medical care. *Id.* Unfortunately, doctors were unable to secure an airway during surgery and the victim fell into a coma. *Id.* The family removed her from life support a few days later after being notified that she was brain dead. *Id.* Thompson's expert also agreed that the victim "'probably' would have died without medical intervention." *Id.* at 20–21. The medical examiner testified that the cause of death was a gunshot wound to the face. *Id.* at 20. The Texas Court of Criminal Appeals

concluded that, even assuming the conduct of the doctors was a concurrent cause, Thompson's conduct in shooting the victim in the cheek "was not 'clearly insufficient' so as to absolve him of criminal responsibility under § 6.04." *Id.* at 20–21.

In *Quintanilla v. State*, a case that the State relies on for support, the Austin court rejected the appellant's argument that the victim's lung empyema and her family's decision to discontinue life support were concurrent causes of death sufficient to cause her death independent of his conduct. 292 S.W.3d 230, 234–36 (Tex. App.—Austin 2009, pet. ref'd). The victim was injured in a car accident in which the appellant was driving; both were intoxicated. *Id.* at 232. She suffered a severe brain trauma, a collapsed lung, and multiple fractures. *Id.* As a result of her injuries, she was in a vegetative state and unable to communicate. *Id.* at 232–33. Although she was initially able to sit in a Gerichair and was taken to group activities at the nursing home, she became increasingly bedridden and developed lung congestion. *Id.* Two years later, her family decided to stop all treatment and she died. *Id.* at 233. The death certificate provided that "the immediate cause of death was right lung empyema due to a chronic vegetative state that was the result of a closed head injury." *Id.* The court explained that the evidence "create[d] an unbroken chain of causation from appellant's conduct and the resulting automobile accident, to the brain trauma and coma, to the chronic vegetative state, to the lung empyema and death." *Id.* at 234. Medical personnel also testified that the victim

would have died in the emergency room if it were not for "extraordinary resuscitative efforts." *Id.* at 235. Therefore, even assuming the lung empyema and discontinuance of life support were concurrent causes, the evidence showed that she would not have developed the empyema or required life support but for appellant's conduct and, thus, the evidence was legally sufficient to prove that appellant was criminally responsible for the victim's death. *Id.* at 235–36.

The case of *Martin v. State* is also instructive. *See* 570 S.W.3d 426 (Tex. App.—Eastland 2019, pet. ref'd). Martin shot a fellow gang member in January 2013. *Id.* at 432. The victim was paralyzed from the chest down and remained in the hospital for several months. *Id.* at 433. Over a year later, he returned to the hospital with a urinary tract infection, which led to severe sepsis and the victim's death. *Id.* The medical examiner testified that the cause of death was complications from multiple gunshot wounds and that she did not find anything that would have caused his death apart from the succession of events that occurred as a result of being shot; "there was no intervening cause." *Id.* at 434–35. Because the victim suffered paralysis and an injured leg as a result of the gunshot wounds, he was susceptible to infections and developed "pneumonia, multiple urinary tract infections, and infections from 'pressure sores.'" *Id.* Martin argued that the evidence was insufficient to show that he caused the victim's death because there was a fourteen-month gap in the victim's medical treatment after the victim was shot and, thus, it was plausible that the victim's infections and resulting sepsis and death were caused

by gross neglect or improper medical treatment. *Id.* at 435. The court rejected Martin's contention and explained that there was no evidence of gross neglect or improper treatment before the jury. *Id.*

From our review of the case law, while this may be the longest time period in which a victim suffered and then ultimately died due to injuries caused by a defendant, the length of K.B.'s delayed death, in and of itself, does not result in legally insufficient evidence to support appellant's capital murder conviction. The evidence showed that appellant asphyxiated K.B. causing her to suffer an anoxic brain injury and ultimately death. Although K.B. was forced to suffer from her injuries for almost thirty years before she died, the evidence showed an unbroken chain of causation leading back to appellant's conduct in 1988. We overrule appellant's second issue.

**Concurrent Causation Instruction**

In his fourth issue, appellant contends that the trial court erred by denying his requested jury charge instruction on concurrent causation under section 6.04(a) of the Texas Penal Code. Section 6.04(a) provides "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE ANN. § 6.04(a).

Appellant requested the following language be included in the applicable law section of the court's jury charge: "A person causes the death of another, if but for the person's conduct operating either alone or concurrently with another cause the death of the other would not have occurred unless the concurrent cause was clearly sufficient to produce the result, and the conduct of the person was clearly insufficient." Additionally, appellant requested the following language be included in the application paragraphs for capital murder and murder:

> The State has the burden of proving that the defendant caused the death of [K.B.]. To prove that the defendant caused the death of the deceased, the State has to show before [sic] beyond a reasonable doubt that either, one, the termination of treatment, chronic pressure ulcers, or bilateral acute bronchopneumonia did not contribute to causing the death; two, the termination of treatment, chronic pressure ulcers, or bilateral acute bronchopneumonia was clearly [i]nsufficient by itself to cause the death of the deceased; or three, the conduct of defendant was clearly sufficient to cause the death of the deceased, regardless of the termination of treatment, chronic pressure ulcers, or bilateral acute bronchopneumonia.

The trial court overruled appellant's requested instructions finding that concurrent causation was inapplicable in this case.

The State responds that the trial court properly denied appellant's concurrent-causation instruction for two reasons: (1) the record contained no evidence of a concurrent cause; and (2) appellant's requested instruction misstated the law and likely would have confused the jury.

In reviewing a jury-charge issue, we first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If we conclude error exists,

we analyze the error for "some harm" to the defendant's rights when the defendant properly objected to the jury charge and for "egregious harm" when the defendant failed to object to the charge. *Id.* at 743–44 (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). The trial court is required to provide the jury with "a written charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in [the] charge calculated to arouse the sympathy or excite the passions of the jury." TEX. CODE CRIM. PROC. ANN. art. 36.14. To be entitled to an instruction on concurrent causation, there must be some evidence that the concurrent cause was clearly sufficient to produce the result (death) and that the defendant's conduct was clearly insufficient to produce the result. *Remsburg v. State*, 219 S.W.3d 541, 545 (Tex. App.—Texarkana 2007, pet. ref'd).

As detailed above, the evidence showed that K.B. died as a result of the anoxic brain injury that she suffered in the 1988 attack. There is no evidence in the record that her death resulted from any other cause. Her treating physicians all agreed that the complications K.B. endured over the years, including the chronic pressure ulcers and bilateral acute bronchopneumonia and the decision to terminate any further treatment of such complications, were a direct result of the brain injury. Such complications were not concurrent causes of death but sequential causes in an unbroken chain; they related back to appellant's asphyxiation of K.B. causing her to

–24–

lose oxygen to her brain. There was no evidence that anything other than the anoxic brain injury led to the other complications. Therefore, the trial court did not err when it overruled appellant's requested jury instructions on concurrent causation. We overrule appellant's fourth issue.

### Admission of 404(b) Evidence to Prove Identity

Appellant argues in his third issue that the trial court erred by admitting extraneous offense evidence of his sexual assaults against K.A.B. and F.M. because he never put identity, or any other enumerated purpose under Rule 404(b)(2), at issue and no other exception allowing such evidence applied. He also argues that the evidence fails Rule 403's balancing test.

Specifically, Appellant asserts that pleading not guilty is insufficient to place identity "at issue." We agree. He also asserts that the only means to place identity at issue is by a defendant challenging identity through opening statement or cross-examination of witnesses. On this point, we disagree.

Generally, the State cannot present evidence of prior crimes, wrongs, or other acts to show that a defendant acted in accordance with that character or had a propensity to commit the crime. TEX. R. EVID. 404(b). However, extraneous offense evidence may be admissible if it is relevant for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2). Extraneous evidence may

also be admissible to rebut a defensive theory. *De La Paz v. State*, 279 S.W.3d 336, 344–47 (Tex. Crim. App. 2009).

Here, the trial court held multiple pre-trial hearings concerning the admissibility of four extraneous offenses that involved appellant entering into a female's residence, without consent, attacking three of the four females, strangling and binding each of those three females in some way, and sexually assaulting them. The State offered the evidence to prove identity and intent, or lack of consent, as to the sexual assault. The trial court found that identity was at issue based on the state of the evidence itself and allowed the State to present evidence of two of the four extraneous offenses. Appellant objected to the admission of the evidence throughout the trial, and the trial court overruled each of his objections. Appellant did not make an opening statement, cross-examine any witnesses, or present any evidence after the State rested. At the conclusion of the State's case, the trial court instructed the jury that it could not consider any extraneous offense evidence unless it believed that appellant committed such offense beyond a reasonable doubt and "even then you may only consider the same in determining identity, if any, in connection with the offense, if any, alleged against him in the indictment and for no other purpose."

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). We reverse a trial court's ruling only if it is outside the "zone of reasonable disagreement." *Id.* If a trial court's decision is correct under any

theory of law applicable to the case, we will uphold it. *De La Paz*, 279 S.W.3d at 344.

The trial court specifically found that the extraneous offense evidence was admissible to prove identity and instructed the jury to limit its consideration of the evidence accordingly. Although the extraneous offense evidence may have been admissible to show intent as to the sexual assault, the other purpose for which the State offered the evidence, we cannot affirm a trial court's decision to admit extraneous offense evidence for a purpose it did not instruct the jury it could consider. *Jackson v. State*, 320 S.W.3d 873, 887 (Tex. App.—Texarkana 2010, pet. ref'd) ("The Texas Court of Criminal Appeals has held that an appellate court cannot affirm a trial court's decision to admit extraneous-offense evidence to rebut a defensive theory if the trial court failed to instruct the jury, in the trial court's limiting instruction, on the extraneous evidence admissibility to rebut a defensive theory.") (citing *Owens v. State*, 827 S.W.2d 911, 917 (Tex. Crim. App. 1992)); *Watkins v. State*, No. 05-05-01210-CR, 2006 WL 2337747, at *5 (Tex. App.—Dallas Aug. 14, 2006, pet ref'd) (not designated for publication) (citing *Owens* and limiting its review to whether the evidence was properly admitted on the basis of identity because jury was not instructed it could consider evidence in determining intent or to rebut a defensive theory). Therefore, we will limit our review to its admissibility to prove identity.

Extraneous offense evidence "may be admissible to show identity only when identity is at issue in the case." *Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006) (*Page III*). It is true that in the cases determining whether identity is at issue the court looks to whether identity is disputed by the defense through opening statement, cross-examination, or affirmative evidence. *See, e.g., Segundo v. State*, 270 S.W.3d 79, 85–86 (Tex. Crim. App. 2008) (holding trial court did not abuse its discretion in finding that appellant raised identity through his cross-examination of the State's DNA experts even where identity was not seriously contested); *Page v. State*, 137 S.W.3d 75, 78–79 (Tex. Crim. App. 2004) (*Page II*) (holding issue of identity may be raised by defendant's cross-examination of complaining witness). But we have found no case, and appellant cites none, in which a court has held that the defendant *must* affirmatively place identity at issue before extraneous offense evidence tending to prove identity becomes admissible. Rather, case law indicates the state of the evidence itself may place identity at issue.

For example, the Texas Court of Criminal Appeals has explained that, although the most common situation that gives rise to the admission of extraneous offense evidence is to rebut a defensive theory, evidence of extraneous offenses may be admissible "[t]o circumstantially prove identity where the state lacks direct evidence on this issue." *Albrecht v. State*, 486 S.W.2d 97, 100–01 (Tex. Crim. App. 1972). "Whether or not the state may prove a collateral crime is to some extent dependent upon the burden of proof imposed upon the state, and the type of evidence

–28–

which the state has to offer in proof of the essential elements of its case." *Id.* at 101 (internal footnote omitted). If the State has undisputed direct evidence of identity, the extraneous offense evidence will likely be inadmissible because its prejudicial effect will far outweigh its relevance to prove identity, as the admission "serves only to establish the accused's bad character." *Id.*

In *Page II*, the court looked to whether identity was at issue when defense counsel cross-examined the complainant about her description of her attacker's weight. 137 S.W.3d at 78–79. Although the court looked to whether the defendant's cross-examination and impeachment of the complainant was sufficient to place identity at issue, it is important to note that the complainant not only identified her attacker by description, but she also provided police with a description of his car and license plate, which the police traced to the defendant, and she identified the defendant as her attacker in a photo line-up and in open court. *Id.* at 76–79. Therefore, the State had presented undisputed direct evidence that the defendant was the person who attacked the complainant and, thus, had the defendant not impeached the complainant regarding identity (or raised a defensive issue as to identity in some other fashion), identity would not have become at issue.

Here, the State did not have undisputed *direct* evidence that appellant murdered K.B. while in the course of committing or attempting to commit aggravated sexual assault of K.B. Because K.B. was brutally attacked, suffered severe brain injury, and was left for dead, she was unable to identify her attacker and

there were no eyewitnesses to the offense. Thus, this is precisely the type of case that identity is at issue even where the defense has not challenged identity through an opening statement or cross-examination of any witnesses. The state of the evidence itself makes identity at issue in this case.

Appellant relies on *Robbins v. State* for the proposition that his not-guilty plea was insufficient to place identity at issue and, thus, the extraneous offense evidence was inadmissible against him. *See* 88 S.W.3d 256, 260 (Tex. Crim. App. 2002). In *Robbins*, the Texas Court of Criminal Appeals stated in dicta that "[a] fair reading of this case law indicates that in Texas a simple plea of not guilty usually does not make issues such as intent a relevant issue of consequence for purposes of determining the admissibility of relationship evidence under Rule 404(b)." *Id.* at 260. The court declined to hold differently even though it recognized that such an outcome is a "catch 22" because intent is a material issue that the State has the burden to prove beyond a reasonable doubt. *Id.* at 261. Instead, the court held that the defendant put intent at issue through defense counsel's vigorous cross-examination of the State's witnesses and his presentation of defensive theories, such as that the victim died by accident due to CPR being improperly performed on her in an effort to save her life and not by any intentional act committed by the defendant. *Id.* at 261. Therefore, the court did not squarely answer the question of whether the state of the evidence itself could place intent, or one of the other enumerated

purposes of Rule 404(b) such as identity, at issue in a case where the defendant does no more than plead not guilty.

Our holding does not conflict with the concern expressed in *Robbins*. We do not hold that identity is at issue in a case simply by the defendant pleading not guilty. Thus, our opinion does not stand for the proposition that the trial court should permit the State to present extraneous offenses in every case in order to show identity. It is the specific facts of this case—a victim who is unable to communicate what happened to her because she was beaten and strangled to near death with no eyewitnesses or other direct evidence that appellant attacked her—that put identity at issue here.

We next consider whether the extraneous offense evidence was relevant to prove identity. Evidence is relevant when it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence. TEX. R. EVID. 401. If the evidence provides even a small nudge toward proving or disproving a fact of consequence, it is relevant. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). "A 'fact of consequence' includes either an elemental fact or an evidentiary fact from which an elemental fact can be inferred." *Henley v. State*, 493 S.W.3d 77, 84 (Tex. Crim. App. 2016).

Extraneous offense evidence is admissible to prove identity when the pattern and common characteristics of the offenses are so distinctively similar to act as the defendant's signature. *Segundo*, 270 S.W.3d at 88; *Page III*, 213 S.W.3d at 336.

"No rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person." *Segundo*, 270 S.W.3d at 88. The law "does not require extraneous-offense evidence to be completely identical to the charged offense to be admissible to prove identity." *Page III*, 213 S.W.3d at 338.

The trial court carefully reviewed the evidence of four extraneous offenses and ruled that two were admissible under Rule 404(b)(2). The admitted extraneous offenses and the instant offense shared significant similarities. The victims in all three cases were females in their twenties, were college or graduate students, had long brown hair, and were of an athletic, petite build. All the attacks occurred in the victims' bedrooms and appellant gained access to their bedrooms by an unlocked door. The evidence in each case showed that appellant watched the victims before attacking them, as neighbors or the victims themselves reported seeing appellant or an Asian man around the victims' residencies prior to the attacks.

Appellant also bound or strangled each victim in some way. He tied F.M.'s hands with a purse strap and put something in her mouth. He strangled K.A.B. and potentially K.B. with a hairdryer cord. Both K.A.B. and K.B. suffered petechial hemorrhaging and brain injury as a result of the strangulation. K.A.B. and K.B. also had similar injuries to their faces, which K.A.B. reported was due to appellant punching her repeatedly in the face. Although appellant did not sexually assault

each of the victims by penetrating their sexual organs with his sexual organ, he did sexually assault each of them in some way. He began by fondling the breasts of F.M. and K.A.B. Fortunately for F.M., she was able to call 9-1-1 before the attack began, and the police interrupted appellant's assault on her. K.A.B. reported that after appellant fondled her breasts, he ripped off her clothes and penetrated her sexual organ with his finger. She was in and out of consciousness due to being strangled with the hairdryer cord, so she was not sure whether appellant also penetrated her sexual organ with his sexual organ. Interestingly, appellant also attacked K.A.B. and K.B. on significant dates in his life. He attacked K.B. on his birthday, and he attacked K.A.B. on his one-year wedding anniversary. Based on the pattern of who appellant targeted, when he targeted them, and how he gained access and then attacked his victims, we cannot say that the trial court abused its discretion in finding that the extraneous offenses were sufficiently similar to the instant offense and, thus, relevant to prove identity. Therefore, we conclude that the trial court did not abuse its discretion in overruling appellant's 404(b) objection.

We next consider whether the trial court abused its discretion in overruling appellant's 403 objection to the extraneous offenses. Rule 403 provides that the trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403. We evaluate the following four factors when conducting a rule 403 analysis: (1) the

probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *State v. Mechler*, 153 S.W3d 435, 440 (Tex. Crim. App. 2005); *Montgomery*, 810 S.W.2d at 389–90. In doing so, we balance the inherent probative force of the evidence with the proponent's need for the evidence against any tendency of the evidence to suggest a decision on an improper basis, to confuse or distract the jury from the main issues of the case, or to be given undue weight, and against the likelihood that the presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). This balancing test "is always slanted toward admission, not exclusion, of otherwise relevant evidence." *De La Paz*, 279 S.W.3d at 343.

The probative value of appellant's extraneous offenses was high even though one extraneous offense occurred a decade after appellant's attack of K.B. *See Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (concluding probative value of strikingly similar offenses was strong even where offenses occurred a decade apart). As discussed above, the three offenses were significantly similar and highly probative to prove identity; the similarity of the offenses made it increasingly more probable that appellant was the person who sexually assaulted and murdered K.B. by asphyxiation. The State's need for the evidence was also compelling. Although the DNA evidence showed that there was less than a one in ten trillion chance that

someone other than appellant contributed the DNA found in K.B.'s vaginal vault, it alone did not prove that appellant attacked K.B. The extraneous offense evidence, coupled with the DNA evidence and the condition in which K.B. was found, proved appellant was K.B.'s attacker. And, while appellant did not challenge the State's evidence by cross-examining witnesses or offering any affirmative evidence of his own, defense counsel vigorously argued in closing argument that the DNA evidence only showed that appellant and K.B. had sexual intercourse, not that it was nonconsensual or that appellant was the person who asphyxiated K.B. Thus, the probative value and the State's need for the extraneous offense evidence in this case was high.

We next look to whether the extraneous offense evidence had the potential to impress the jury in some irrational, yet indelible way, such as causing the jury to reach its decision on a moral or emotional basis rather than as a reasoned response to the relevant evidence. *See Montgomery*, 810 S.W.2d at 395. Here, the attacks on K.A.B. and F.M. were no more heinous than the attack on K.B. In fact, the assaults of K.A.B. and F.M. were less gruesome because, fortunately, the assaults did not result in their deaths. Additionally, the trial court instructed the jury that it could consider the extraneous offenses only for the purpose of identity. We are aware of the danger of a jury being distracted by such extraneous evidence; however, we are to presume the jury followed the trial court's instructions. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). Thus, any potential to impress the jury in

–35–

an irrational way was minimized through the court's limiting instruction. *See Lane*, 933 S.W.2d at 520 (concluding that, although admission of extremely similar extraneous offenses carries the potential to impress the jury in an irrational way by suggesting the defendant conformed to his character, "the impermissible inference of character conformity can be minimized through a limiting instruction"). The jury instruction also helped ensure that the jury was not distracted from determining the elements of the case or that it did not give the extraneous offense evidence undue weight.

The extraneous offense evidence was not cumulative of any other evidence admitted at trial, and the time needed to present the evidence to the jury was short. The State presented its case over a span of four days and called twenty-nine witnesses to testify. The State used four of those witnesses to present evidence of the extraneous offenses against K.A.B. and F.M. Their testimony spanned only seventy-six pages of the record.

We cannot conclude that the trial court abused its discretion in finding that the probative value of appellant's extraneous offenses against K.A.B. and F.M. was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or needless presentation of cumulative evidence.

The trial court did not abuse its discretion in admitting the extraneous offense evidence to prove identity over appellant's rule 403 and 404(b) objections. Appellant's third issue is overruled.

## Statute of Limitations

In his final issue, appellant argues that the trial court erred in denying his pretrial motion to dismiss the case because it was barred by the five-year statute of limitations for aggravated sexual assault. Appellant's argument is without merit.

Appellant was not tried and convicted of aggravated sexual assault. He was tried and convicted of the capital murder of K.B. while in the course of committing or attempting to commit aggravated sexual assault of K.B. Thus, while evidence of appellant's aggravated sexual assault of K.B. was required to prove appellant committed capital murder, the State was not seeking a conviction for aggravated sexual assault. The offense of murder has no statute of limitations. TEX. CODE CRIM. PROC. ANN. art. 12.01(1)(A); *see also* Act of May 24, 1973, 63rd Leg., R.S., ch. 399, § 2(B), art. 12.01(1), 1973 Tex. Gen. Laws 883, 975; (language in effect in 1988) (amended 2001) (current version at TEX. CODE CRIM. PROC. ANN. art. 12.01(1)(A)). And the Texas Court of Criminal Appeals has held that capital murder "is a species of murder" and, like murder, does not have a statute of limitations. *Demouchette v. State*, 731 S.W.2d 75, 80 (Tex. Crim. App. 1986); *see also Cobb v. State*, No. 11-07-00171-CR, 2009 WL 223455, at *1 (Tex. App.—Eastland Jan. 30, 2009, pet. ref'd) (mem. op., not designated for publication) (holding that underlying robbery, for which statute of limitations had run, and the murder merged into one offense, capital murder, which had no limitations). We reject appellant's arguments to the contrary and overrule his fifth issue.

## Conclusion

Having concluded the evidence is legally sufficient to support appellant's conviction for capital murder and overruling his remaining issues, we affirm the trial court's judgment.

/Craig Smith/
CRAIG SMITH
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
191178F.U05



## Court of Appeals
## Fifth District of Texas at Dallas
### JUDGMENT

GEORGE GUO, Appellant

No. 05-19-01178-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District Court, Dallas County, Texas Trial Court Cause No. F19-00090-M. Opinion delivered by Justice Smith. Justices Schenck and Garcia participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered January 26, 2022